**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMY HUFFMAN,<br><br>Plaintiff,<br><br>v.<br><br>ROC NATION LLC, JERMAINE JACKSON a/k/a GERMAINE JACKSON, DANIEL BERG, DRNX WATER, LLC, AND DRNX, LLC,<br><br>Defendants. | Docket No.: 1:26-cv-7175<br><br>VERIFIED COMPLAINT AND<br><br>DEMAND FOR A JURY TRIAL |

Amy Huffman ("Huffman" or "Plaintiff"), by and through her counsel of record, Brazzano Law PLLC, as and for Plaintiff's Verified Complaint herein against Roc Nation LLC ("Roc Nation"), Jermaine Jackson a/k/a Germaine Jackson ("Jackson"), Daniel Berg ("Berg"), DRNX Water, LLC ("DRNX Water"), DRNX, LLC ("DRNX," and together with DRNX Water, the "DRNX Enterprise") (DRNX Enterprise, Roc Nation, Jackson, and Berg, collectively "Defendants").

**PRELIMINARY STATEMENT**

1. The law does not permit a corporation to stand aside while an entrenched insider wages a campaign of severe, pervasive sexual harassment, targeted defamation, and unlawful retaliation against a female executive, and then use the wreckage of that campaign as the pretext for her ouster.

2. This Verified Complaint details Defendants' receipt of detailed complaints of, *inter alia,* unlawful sexual harassment, sexualized defamation, their utter failure to take meaningful corrective action and, upon information and belief, their disclosure of those protected complaints

to the harasser, Jackson, followed by escalating retaliation without consequence to Jackson.

3. Defendants are responsible and should not escape accountability by cloaking their inaction in the language of process and deliberation while the harassment continues to escalate, not when, as here, the Defendants possessed both the notice and the authority to stop the misconduct, and chose instead to shield Jackson.

4. Justice does not countenance a corporate culture in which sexual harassment is ignored, defamatory falsehoods of a sexual nature are permitted to metastasize, and the harasser is protected rather than the Plaintiff who exposed the unlawful conduct.

5. The law imposes liability not only upon those who commit unlawful acts, but also upon those who knowingly permit them, ratify them, and ultimately weaponize their consequences against the individual courageous enough to report them.

6. This action arises from precisely that sequence of events.

7. Plaintiff pleads below the factual detail underlying that campaign, a sustained course of sexual harassment, gender-based hostility and discrimination, defamation, retaliation, and unlawful workplace misconduct directed at Plaintiff in her role as Chief Executive Officer.

8. Beginning in or about August 2025, Jackson embarked upon a deliberate effort to undermine Plaintiff's authority, credibility, and professional standing within Roc Nation and the DRNX Enterprise after Plaintiff refused to participate in the fiction that prudent business expenditures were wasteful merely because Jackson said so.

9. Plaintiff was hired by Roc Nation for her business expertise and was expected to exercise independent judgment.

10. Jackson, by contrast, repeatedly demanded that Plaintiff recant her decisions, admit fault where none existed, and validate his criticisms regardless of their merit.

11. When Plaintiff refused to surrender her professional judgment or provide the personal deference Jackson demanded, Jackson's disagreement with Plaintiff's decisions evolved into a campaign to discredit, sexually harass, marginalize, and ultimately remove her from the Chief Executive Officer position.

12. Jackson repeatedly defamed Plaintiff, falsely stating that she obtained DRNX Enterprise business through sexual conduct, spread false and humiliating sexual accusations concerning her personal relationships, disparaged her before her own staff, subordinates, and third parties, and sought to portray her success as the product of sexual impropriety rather than professional acumen and demonstrated accomplishment.

13. The culminating event that drove Plaintiff to lift her voice and report Jackson's conduct was not the accumulated workplace misconduct alone, but Jackson's decision to reach beyond the workplace and into Plaintiff's marriage and personal life.

14. On January 15, 2026, Jackson telephoned Plaintiff's husband, Michael Huffman (Mr. Huffman"), and made false and defamatory statements accusing Plaintiff of infidelity, racial discrimination, and financial mismanagement, as alleged below. It was this deliberate intrusion into Plaintiff's family, layered atop months of workplace harassment and escalating defamation, that convinced Plaintiff she could no longer remain silent, and that reporting Jackson's conduct to Roc Nation and Berg was necessary to protect not only herself and other employees, but her marriage and her family.

15. Jackson's accusations were false. They were also devastating. By falsely portraying Plaintiff as a woman who obtained business through sexual relationships, engaged in inappropriate sexual conduct with prospective business partners, discriminated against employees based upon race, and manipulated professional relationships through personal conduct, Jackson attacked and

sabotaged Plaintiff's reputation in the precise sphere in which she earned her livelihood: as the Chief Executive Officer of a growing consumer-products company, DRNX Water, an entity that Roc Nation exercised extreme and substantial financial, governance, and operational control.

16. Plaintiff reported the sexual harassment and other unlawful conduct to her employer, Roc Nation, including its Chief of Staff and Legal Counsel, Colin Brown, and its Head of Mergers and Acquisitions, Alex Ingram, both of whom occupied senior leadership positions within Roc Nation and to whom Plaintiff regularly reported concerning the operations, finances, governance, and strategic direction of the DRNX Enterprise.

17. As senior Roc Nation executives responsible for overseeing the enterprise and supervising Plaintiff's work as Chief Executive Officer, Brown and Ingram were uniquely positioned and had a duty to elevate Plaintiff's complaints, ensure that they were investigated, bring them to the attention of Roc Nation's executive leadership, implement protective measures, and prevent the continuing harm and retaliation described herein.

18. Roc Nation possessed both the authority and the obligation to act.

19. Roc Nation controlled the capital upon which DRNX depended, exercised veto authority over executive appointments, budgets, financing, and material corporate actions, employed Plaintiff directly, received her complaints, and possessed the practical ability to stop Jackson’s unlawful conduct directed at Plaintiff and to prevent Jackson’s further harassment and retaliation against Plaintiff.

20. Roc Nation's response to Plaintiff's complaints did not occur in a vacuum.

21. Upon information and belief, Jackson maintained a longstanding professional relationship with NBA star LaMelo LaFrance Ball (“Ball”), a principal of the DRNX Enterprise and one of Roc Nation Sports LLC's most valuable athlete relationships (Roc Nation is, upon

information and belief, the sole member of Roc Nation Sports LLC).

22. Upon information and belief, by the time Plaintiff reported Jackson's salacious and unlawful conduct and misconduct, LaMelo Ball had become one of the most commercially valuable athletes within Roc Nation's portfolio; Jackson's longstanding relationship with Ball afforded him unusual influence within the Roc Nation ecosystem.

23. Plaintiff does not allege that Roc Nation expressly chose commercial interests over legal compliance.

24. Rather, the facts support the inference that, despite receiving detailed complaints, witness information, and reports of escalating unlawful misconduct and retaliation, Roc Nation possessed powerful institutional incentives to avoid a direct confrontation with Jackson, and by extension, LaMelo Ball.

25. Whatever the reason, the result was the same.

26. Roc Nation failed to conduct a meaningful investigation, failed to implement corrective measures, failed to protect Plaintiff and other employees, and failed to intervene as Jackson's unlawful conduct escalated.

27. Instead, Roc Nation, upon information and belief, informed Jackson of Plaintiff's complaints, thereby empowering Jackson and setting in motion the abhorrent retaliation that followed.

28. Roc Nation did precisely nothing to safeguard Plaintiff's protected right to work in a space free of predatory harassment while she remained employed.

29. Perhaps Colin Brown's promotion to Chief Operating Officer and EVP Legal Affairs at Roc Nation, just weeks after Plaintiff's protected complaints, explains why he chose comfort over conscience.

30. Plaintiff also reported the sexual harassment and other unlawful conduct, as pleaded *supra* ¶¶ 8-13, to Daniel Berg.

31. As a member of DRNX LLC holding governance authority over the DRNX Enterprise, Berg owed a duty to act reasonably upon receiving notice of unlawful conduct within the DRNX Enterprise. Despite receiving, on January 30, 2026, the same detailed information concerning Jackson's sexual harassment, defamation, and retaliatory conduct that Plaintiff provided to Roc Nation, including the specific incidents, witnesses, and defamatory statements alleged above, Berg did nothing. He conducted no investigation, took no corrective action, imposed no restriction on Jackson's continued access to Plaintiff, personnel, and operations, and made no effort of any kind to protect Plaintiff from the misconduct she had reported. Berg's inaction was total and complete despite his duty, his authority, and his actual knowledge.

32. Jackson's attacks on Plaintiff were purposeful and intentional, not the byproduct of an ordinary business dispute. Through false and sexualized defamatory accusations, Jackson deliberately set out to destroy Plaintiff's credibility and reputation, both personally and professionally, as further alleged below.

33. Plaintiff's reputation was purposely and maliciously sabotaged by Jackson, including, upon information and belief, Jackson boasting to DRNX employees that he fired Plaintiff, despite his lack of any authority to do so.

34. Jackson's false and slanderous statements alleged herein were made with the intent to harm Plaintiff in her professional CEO role, including statements that Plaintiff was incompetent or dishonest in her trade, profession, or occupation, and falsely attributed sexual misconduct by Plaintiff, thereby imputing unchastity or sexual impropriety, all of which are defamation *per se*.

35. A member of DRNX's sales staff contemporaneously recognized the severity of

Jackson’s abusive behavior, stating, in substance, that separating Jackson from Plaintiff would allow her to "heal from that torment."

36. Far from correcting the misconduct, Roc Nation’s, and by extension, Berg’s, empty response emboldened it.

37. Two weeks before Plaintiff reported the complaints to Roc Nation (and Berg), on January 15, 2026, Jackson escalated his campaign against Plaintiff beyond the workplace and into her personal life.

38. While Plaintiff's husband, Mr. Huffman, was meeting with a customer and unavailable to respond, Jackson repeatedly attempted to contact him, placing approximately five to six telephone calls over the course of roughly two hours.

39. At approximately 1:21 p.m., Mr. Huffman contacted Plaintiff and reported that Jackson had been calling him repeatedly throughout the morning, asking whether Plaintiff knew why Jackson was attempting to reach him with such persistence.

40. Mr. Huffman later tried to return Jackson’s call; Jackson immediately called back and engaged him in a conversation lasting approximately thirty-two minutes.

41. Upon information and belief, during that communication on January 15, 2026, Jackson made false and defamatory statements concerning Plaintiff's personal conduct, infidelity, professional relationships, professional competence, financial mismanagement, and stated that Plaintiff was a racist.

42. Jackson's contacting Plaintiff's husband furthered a deliberate effort to extend his campaign of sexual harassment, gender discrimination, and defamatory publications that concerned Plaintiff beyond the workplace, interfere with her marriage, and inflict outrageous personal, emotional, professional, and reputational harm.

43. After Plaintiff reported Jackson's unlawful conduct to Roc Nation (and Berg), rather than investigate Plaintiff's complaints or take action against Jackson, the architect of the harassment, defamation, and retaliation described herein, Roc Nation, and by extension, Berg, allowed the resulting damage to Plaintiff's authority, credibility, and professional standing to take hold throughout the organization and then relied upon that damage as a purported justification for adverse employment action and Roc Nation's own retaliation against her.

44. After Plaintiff's reporting of sexual harassment and other unlawful conduct to Roc Nation and Berg on January 30, 2026, during a recorded meeting held on February 10, 2026, Jackson openly acknowledged to an employee of his repeated communications with Plaintiff's husband, reaffirmed and published sexualized and defamatory accusations concerning Plaintiff, and made clear that he intended to continue attacking Plaintiff's reputation, authority, and future employment prospects. The recording captures Jackson's escalated and continued dissemination of false and sexualized accusations concerning Plaintiff, and also exposes Jackson's separate sexual harassment and effort to intimidate a female employee.

45. The recording further supports the inference that Jackson regarded his longstanding and lucrative relationship with Roc Nation as affording him substantial institutional protection.

46. Plaintiff's authority was systematically stripped away. Her benefits were terminated. Her compensation ceased.

47. The disruption and dysfunction caused by Jackson's misconduct were not attributed to the individual who created them, but instead were recast as deficiencies attributable to Plaintiff herself.

48. This action seeks to hold Defendants accountable for the foreseeable and devastating consequences of their intentional choices and to obtain redress for the devastating

professional, financial, and reputational harm inflicted upon Plaintiff.

## THE PARTIES

### PLAINTIFF

49. Plaintiff is an individual domiciled in Lake Wylie, South Carolina.

50. Plaintiff is a married woman over the age of 40.

51. At all relevant times, Plaintiff was a W-2 employee of Roc Nation.

52. Roc Nation and the DRNX Enterprise each exercised control over material aspects of Plaintiff's work, as alleged below.

53. Roc Nation deployed Plaintiff as Chief Executive Officer of DRNX Water, an entity over which Roc Nation exercised substantial financial and governance control. Plaintiff alleges that Roc Nation and the DRNX Enterprise were her joint employers.

54. As Chief Executive Officer, Plaintiff held a seat on the DRNX Water Board of Managers pursuant to Section 3.1(b)(i) of the LLC Agreement (the "DRNX Agreement").

55. Plaintiff's Chief Executive Officer role with DRNX Water was part of and performed through her employment relationship with Roc Nation and the DRNX Enterprise.

56. Plaintiff regularly traveled to New York City for business meetings, governance sessions, Roc Nation executive meetings, including meetings with its Chief Executive Officer, Desiree Perez, and partner-facing functions.

57. Plaintiff communicated continuously to and from New York, with Roc Nation's New York personnel.

58. Plaintiff's role was directed from Roc Nation's New York headquarters throughout her employment.

59. At all relevant times, Plaintiff met the definition of an "employee" or "eligible

employee" under the applicable federal, state, and city statutes pleaded herein.

60. After Plaintiff was shoved out of her CEO position, she applied for, and received, New York State unemployment benefits.

61. Having received New York unemployment benefits, the State of New York has a documented financial and administrative interest in Plaintiff's employment and her unlawful removal.

**DEFENDANTS**

**ROC NATION**

62. Roc Nation LLC is a Delaware limited liability company with its principal place of business at 540 West 26th Street, New York, New York 10001.

63. Roc Nation is registered to do business in New York, Department of State Identification No.: 3653727 since April 3, 2008.

64. At all relevant times, Roc Nation was and met the definition of an "employer" or "covered employer" under all applicable federal, state, and city statutes as they relate to Plaintiff.

65. Roc Nation derives substantial revenue from its purposeful activities in this District, and its members, and each of them, likewise derive substantial income and/or compensation and/or remuneration, based upon the actions directed at this District in New York.

66. Roc Nation has two members: (a) Live Nation Worldwide Inc. and (b) Marcy Media LLC.

67. Live Nation Worldwide Inc. is a Delaware corporation with its principal place of business in Beverly Hills, California, and is therefore a citizen of Delaware and California for purposes of diversity jurisdiction. Live Nation Worldwide Inc. is not a citizen of South Carolina. This allegation is based upon Live Nation Entertainment, Inc.'s publicly filed corporate

disclosures, SEC filings, and state registration records, which confirm its state of incorporation and principal place of business.

68. Marcy Media LLC has five members: Jay Brown, Tyran Smith, Desiree Perez, Juan Perez, and Marcy Media Holdings LLC.

69. Marcy Media Holdings LLC has two members: Shawn Carter and Marcy Media Acquisition Holdings LLC.

70. Marcy Media Acquisition Holdings LLC has one member: Shawn Carter.

71. For purposes of 28 U.S.C. § 1332, Roc Nation LLC is a citizen of each state in which each of its members, and each member of every constituent limited-liability company, is a citizen. Upon information and belief, none of Roc Nation LLC's members or constituent members is a citizen of South Carolina. The citizenship of each constituent member is, upon information and belief, New York, New Jersey, California, and/or Delaware.

72. Roc Nation paid Plaintiff's wages and benefits, directed her work as CEO of the DRNX Enterprise, and held ongoing supervisory and governance authority over her employment.

73. Approval of Roc Nation's manager was required under Section 3.4(e) of the DRNX Agreement for any change to officer compensation.

74. Roc Nation controlled the DRNX Enterprise finances, including capital contributions under Section 5.3(b) of the DRNX Agreement, and held veto authority over distributions, budgets, and financing.

75. Roc Nation was also a party to and signatory of the DRNX Agreement, executed by Roc Nation's CEO, Desiree Perez.

**JERMAINE JACKSON**

76. Defendant Jackson is, upon information and belief, a citizen of the State of

Michigan, and is registered to vote in Michigan.

77. Jackson is a member, equity holder, and/or beneficial owner of DRNX LLC and, through that ownership interest, possessed a substantial economic interest in the DRNX Enterprise.

78. Jackson participated in and exercised substantial influence over the DRNX Enterprise's operations, personnel, and decision-making, including matters affecting Plaintiff's employment with Roc Nation.

79. Upon information and belief, Jackson used his ownership interest in, and personal relationships within, the DRNX Enterprise to exert undue influence across each of the entity Defendants, Roc Nation, DRNX Water, and DRNX LLC, leveraging their intertwined, New York-centered governance structure to direct communications, influence personnel decisions, and affect enterprise operations.

80. Upon information and belief, although Jackson was not formally employed by Roc Nation, Roc Nation knowingly permitted Jackson to exercise substantial apparent authority in matters relating to the governance, management, operations, personnel, strategic direction, and business affairs of the DRNX Enterprise.

81. Roc Nation further permitted Jackson to exercise substantial influence over enterprise personnel, vendors, distributors, business partners, and operational decision-making, notwithstanding the absence of any formally documented authority authorizing him to exercise that level of control.

82. At all relevant times, Jackson acted with apparent authority and/or authority later ratified by Roc Nation and the DRNX Enterprise. Alternatively, Roc Nation knowingly acquiesced in Jackson's exercise of authority, accepted the benefits of his conduct, failed to repudiate his actions, and thereafter implemented, approved, adopted, or ratified decisions that Jackson

advocated concerning Plaintiff, her authority, her employment, and her future within the enterprise.

83. Accordingly, upon information and belief, Jackson's actions were undertaken with the knowledge, acquiescence, and/or ratification of one or more entity Defendants, as alleged more fully below.

84. Jackson was present in Roc Nation's New York office, upon information and belief, regularly, including approximately every four to six weeks, to meet Desiree Perez, and he separately met with Juan Perez, Roc Nation's Sports President.

85. Upon information and belief, Jackson's New York presence often included meetings and/or conversations about DRNX Enterprise business relating to LaMelo Ball's transactional dealings for both Roc Nation and the DRNX Enterprise.

86. Jackson's conduct was purposefully directed to and had foreseeable consequences in New York, including harm to Plaintiff's employment relationship with a New York-based employer and to enterprise operations directed in substantial part from this District.

87. Upon information and belief, Jackson regularly communicated with New York–based personnel, engaged with Roc Nation enterprise decision-makers located in New York, and acted within a governance structure that required approval and oversight from New York.

88. Those New York contacts included recurring in-person meetings and communications concerning DRNX Enterprise business.

89. Jackson's personal jurisdiction contacts are grounded in his own purposeful availment of New York, not merely in Plaintiff's location or employment. Jackson chose to hold an ownership interest in DRNX LLC, a New York domestic limited liability company organized under New York law and subject to New York's governance regime. Through that New York

entity, Jackson participated in and exercised substantial influence over the DRNX Enterprise, directed communications to and from New York-based Roc Nation personnel, and used the New York-anchored governance structure to influence decisions by which he sought to remove Plaintiff from her Chief Executive Officer role. The claims asserted herein arise directly from Jackson's use of that New York entity and his New York-directed communications to cause injury to Plaintiff's employment relationship with her New York-based employer.

90. Jackson exercised substantial influence over the Defendants' entity enterprises and over Plaintiff's employment.

**DANIEL BERG**

91. Defendant Daniel Berg is, upon information and belief, a citizen of the State of New York residing at 1000 Park Avenue, #6B, New York, New York 10028.

92. Berg is a member, equity holder, and/or beneficial owner of DRNX LLC and is one of the three individuals, together with Jackson and LaMelo Ball, who own DRNX LLC in approximately equal thirds.

93. As a member of DRNX LLC, Berg held governance authority over the DRNX Enterprise and participated in the governance structure through which enterprise personnel, operations, and decision-making could be addressed.

94. On January 30, 2026, the same day Plaintiff reported Jackson's sexual harassment, defamation, and other unlawful conduct to Roc Nation, Plaintiff separately and directly reported that same conduct to Berg, providing him with substantially the same detailed information concerning Jackson's unlawful misconduct that she provided to Colin Brown and Alex Ingram, including the August 28, 2025 trade show incident, the defamatory statements made to Plaintiff's husband, the January 22, 2026 meeting, and the identity of witnesses to Jackson's harassment and

sexualized defamation of Plaintiff.

95. Despite receiving actual notice of Jackson's unlawful misconduct on January 30, 2026, Berg failed to investigate Plaintiff's complaint, failed to take corrective action, and failed to use the governance authority available to him to address or limit Jackson's continued sexual harassment and retaliation against Plaintiff.

96. Berg's knowledge of Plaintiff's complaint is further corroborated by Jackson's own recorded acknowledgment that Jackson was aware Plaintiff had complained about his conduct to Berg, Everett Deal ("Deal"), and Roc Nation directly.

97. Berg received direct notice of Plaintiff's protected complaints and thereafter took no corrective action.

**DRNX WATER**

98. DRNX Water, LLC is a Delaware limited liability company that, upon information and belief, operated within an affiliated structure that included DRNX LLC and Roc Nation, each of which exercised material ownership, governance, financing, and/or operational functions.

99. DRNX Water conducted business in this District through those affiliates and through its relationship with Roc Nation, a New York-based entity that exercised substantial control over the enterprise's governance and capital.

100. Desiree Perez, through Roc Nation's New York headquarters, exercised substantial decisional authority concerning DRNX Water's funding, finances, and operational strategy.

101. Upon information and belief, DRNX Water's operations, financing, and executive decision-making were directed and supervised in substantial part from New York, including through DRNX LLC and Roc Nation's New York headquarters.

102. DRNX Water's activities were therefore not confined to Delaware, but were

conducted as part of a multi-state enterprise with substantial New York-based governance and financing.

103. The conduct at issue in this action, including the failure to investigate, intervene, remediate and correct unlawful conduct, was directed from and occurred, in substantial part, in New York.

104. Upon information and belief, DRNX Water transacted business in New York and operated within a corporate structure substantially connected to this District.

105. Upon information and belief, DRNX Water LLC conducted additional operations in North Carolina and Michigan, while governance, funding, and strategic oversight were exercised through New York-based Roc Nation personnel and entities.

106. Upon information and belief, DRNX Water, LLC is owned as follows: Roc Nation LLC holds an approximate fifteen percent (15%) membership interest, and DRNX LLC holds the remaining approximate eighty-five percent (85%) membership interest.

107. Upon information and belief, and as alleged in Paragraph 70 above, Roc Nation LLC's citizenship, for purposes of diversity jurisdiction, extends through its members to the States of New York, New Jersey, California, and Delaware.

108. Upon information and belief, DRNX LLC, in turn, is owned in approximately equal thirds by LaMelo Ball, a citizen of North Carolina; Berg, a citizen of New York; and Jackson, a citizen of Michigan, as alleged above. Because the citizenship of a limited liability company for purposes of diversity jurisdiction is determined by the citizenship of each of its members, DRNX Water, LLC is, upon information and belief, a citizen of New Jersey, California, Delaware, North Carolina, New York, and Michigan. No member of DRNX Water, LLC, at any level, is a citizen of South Carolina.

**DRNX LLC**

109. DRNX LLC is a New York domestic limited liability company.

110. Upon information and belief, DRNX LLC maintains its principal office at 521 E. Morehead Street, Suite 405, Charlotte, North Carolina.

111. Upon information and belief, DRNX LLC served as an operating, administrative, and/or financial arm of the DRNX Enterprise.

112. DRNX LLC functioned as part of an integrated enterprise with DRNX Water and Roc Nation.

113. The acts and omissions giving rise to Plaintiff's claims, including communications, decision-making, and the failure to act after notice of unlawful conduct, were undertaken through or in connection with DRNX LLC's governance role and, in substantial part, within this District.

114. Upon information and belief, as alleged above, DRNX, LLC is owned in approximately equal thirds by Ball, Berg, and Jackson, whose respective citizenships in North Carolina, New York, and Michigan are alleged above. Because the citizenship of a limited liability company for purposes of diversity jurisdiction is determined by the citizenship of each of its members, DRNX, LLC is, upon information and belief, a citizen of North Carolina, New York, and Michigan. No member of DRNX, LLC is a citizen of South Carolina.

115. Upon information and belief, Ball is domiciled in North Carolina and is a citizen of North Carolina, and Ball is registered to vote in North Carolina.

116. DRNX LLC is named as a defendant because it is the vehicle through which Jackson held and purported to exercise authority over DRNX Water and because its governance role is directly implicated by the conduct alleged herein.

### THE ROC NATION/DRNX ENTERPRISE STRUCTURE AND RELATIONSHIP

117. Roc Nation, DRNX Water, and DRNX LLC operated as an integrated enterprise, and Jackson exercised substantial influence throughout that enterprise notwithstanding the absence of any formal office or employment relationship with Roc Nation or DRNX Water.

118. Roc Nation supplied the enterprise's capital, exercised veto authority over budgets, financing, and executive appointments, and exercised substantial governance authority over DRNX Water through the DRNX Agreement.

119. Defendants operated, for relevant purposes, as an integrated enterprise: Roc Nation supplied the capital, exercised governance authority, controlled executive leadership, and possessed the ability to intervene; DRNX LLC served as the New York-based ownership and governance vehicle; DRNX Water served as the operating entity; and Jackson exercised substantial influence throughout the enterprise and acted as a central participant in personnel, operational, and strategic decisions. The conduct alleged herein arose from that collective structure and from the actions, communications, approvals, ratifications, and omissions of its participants. Defendants did not operate as separate silos.

### JURISDICTION AND VENUE

120. This Court possesses jurisdiction over this action on multiple, independent grounds. As set forth above, this Court possesses diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) over all Defendants, as complete diversity of citizenship exists between Plaintiff and each Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.

121. This Court further possesses federal question jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiff's claim against Defendant Roc Nation LLC, her employer, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., as Plaintiff has received a

Notice of Right to Sue from the Equal Employment Opportunity Commission ("EEOC") dated July 21, 2026, annexed hereto as Exhibit A, with respect to that charge.

122. Plaintiff intends to separately file an additional Charge of Discrimination with the EEOC concerning the conduct alleged herein as against the DRNX entities, and upon receipt of a Notice of Right to Sue on that charge, Plaintiff will seek leave to amend this Complaint to assert the full scope of claims available under applicable federal.

123. This Court further possesses supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiff's remaining state-law claims against all Defendants, including those against Defendants other than Roc Nation, as those claims arise from the same case or controversy as the claims over which this Court has original jurisdiction.

124. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, including Roc Nation's receipt of Plaintiff's complaints in New York, the decisions made or ratified in New York concerning the investigation, response to, and handling of those complaints, the direction of Plaintiff's employment from New York, Plaintiff's wages and benefits were administered from New York and the New York-based communications among Berg and Roc Nation executives Colin Brown and Alex Ingram, and other New York-based personnel, regarding Plaintiff's complaints, employment status, authority, and future role within the enterprise.

**PERSONAL JURISDICTION OVER DEFENDANTS**

125. As alleged above, each Defendant maintained sufficient contacts with New York, whether through domicile, organization under New York law, principal place of business, or purposeful participation in a New York-centered enterprise, to support personal jurisdiction in this District.

126. Roc Nation, as alleged above, maintains its principal place of business in this District and directed, from New York, the conduct at issue in this action. Roc Nation is therefore subject to both general and specific personal jurisdiction in this District.

127. DRNX LLC, as alleged above, is organized under New York law and served as the governance vehicle through which the conduct at issue was directed. DRNX LLC purposefully availed itself of the privilege of conducting activities in New York and is therefore subject to specific personal jurisdiction in this District.

128. DRNX Water, as alleged above, was directed, controlled, and governed in substantial part by New York-based actors, and Plaintiff's claims arise from that New York-directed conduct. DRNX Water is therefore subject to specific personal jurisdiction in this District.

129. Jackson, as alleged above, purposefully availed himself of the privilege of conducting business in New York through his ownership interest in DRNX LLC and his direct participation in a New York-centered enterprise, and Plaintiff's claims arise directly from that conduct. Jackson's contacts with New York are his own, independent of Plaintiff's residence in South Carolina, and are alone sufficient to subject Jackson to specific personal jurisdiction in this District notwithstanding his Michigan domicile.

130. Berg, as alleged above, is domiciled in New York and is subject to general personal jurisdiction in this District on that basis alone. Berg is independently subject to specific personal jurisdiction by virtue of his purposeful participation in the New York-centered enterprise described above.

131. As alleged in the Roc Nation/DRNX Enterprise Structure and Relationship section above, Defendants operated as an integrated enterprise rather than as separate silos, a structure relevant to the allocation of authority, notice, and responsibility for the conduct at issue.

**ADMINISTRATIVE PREREQUISITES**

132. Plaintiff timely filed a Charge of Discrimination with the EEOC naming Roc Nation and has received a Notice of Right to Sue.

133. Plaintiff asserts herein the Title VII claims against Roc Nation for which she has exhausted the applicable administrative prerequisites, together with the New York State and New York City Human Rights Law claims pleaded herein. Plaintiff expressly reserves the right to seek leave to amend to assert corresponding federal employment claims against the DRNX entities following exhaustion of the administrative prerequisites applicable to those entities.

134. Plaintiff will timely serve a copy of this Verified Complaint upon the New York City Commission on Human Rights and the Corporation Counsel of the City of New York as required by N.Y.C. Admin. Code § 8-502(c).

**FACTUAL ALLEGATIONS**

135. Plaintiff is a respected wife, mother, and executive, whose exceptional professional reputation has been cultivated and built over decades of integrity, grit, competence, and demonstrated leadership.

136. Plaintiff was hired by Roc Nation to lead DRNX Water, grow the business, protect investor capital, and create value for the enterprise.

137. Instead, Plaintiff found herself confronting a workplace dominated by Jackson's abusive behavior, sexual and gender hostility, repeated profanity-laced tantrums and outbursts, and utter exploitation of authority he claimed to possess within the enterprise.

138. Plaintiff refused to compromise her principles, refused to participate in misconduct, and refused to remain silent when Jackson's conduct threatened the business, its employees, and eventually her family.

139. For that, Plaintiff raised her voice and reported Jackson's unlawful conduct to Roc Nation, her employer, and Berg, in his capacity as owner of the DRNX Enterprise.

140. For that, she became a target. After Plaintiff made those complaints, Jackson's unlawful conduct directed at Plaintiff intensified.

141. Jackson systematically stripped Plaintiff of authority, undermined her standing with employees, subjected her to sexualized and defamatory attacks, interfered with her ability to perform her duties, caused her confidential work email communications to be automatically diverted and forwarded to an unauthorized third-party account, and ultimately succeeded in driving her from the Chief Executive Officer role she had been recruited to fill.

142. Plaintiff pleads that what followed was not an ordinary business disagreement, but a smear campaign designed to remove her when she refused to submit to Jackson's claimed (albeit feigned) authority and reported his outrageous misconduct.

143. Plaintiff was employed by Roc Nation as a W-2 employee and was deployed to serve as Chief Executive Officer of DRNX Water within the DRNX Enterprise.

144. Roc Nation determined and administered material aspects of Plaintiff's compensation, benefits, reporting structure, and authority, and her role required her to manage operations, direct personnel, develop and maintain relationships with prospective business partners and vendors, and represent the DRNX Enterprise in the business marketplace.

145. Throughout her tenure, Plaintiff successfully developed distributor relationships, managed enterprise operations, negotiated vendor relationships, supervised personnel, and repeatedly worked to maintain business continuity despite chronic funding interruptions and operational instability beyond her control. Prior to her January 30, 2026 complaints, Plaintiff had never been advised by Roc Nation that her performance was deficient, that her employment was

in jeopardy, or that she was failing to meet expectations as Chief Executive Officer.

146. After Plaintiff was hired, and during a spring 2025 meeting with Roc Nation's CEO, Desiree Perez, Ms. Perez informed Plaintiff that Jackson "needed to be managed."

147. But, when it counted, and despite that acknowledgment, Plaintiff alleges that Roc Nation utterly failed to "manage" Jackson, and failed to take meaningful corrective action when she later reported Jackson's unlawful misconduct.

148. Plaintiff's effectiveness as Chief Executive Officer depended on her credibility with her team and with external partners.

149. Throughout her employment, Plaintiff worked in coordination with Roc Nation's New York–based leadership, including senior executives and legal personnel, and participated in meetings, communications, and operational directives that originated from New York.

150. Plaintiff maintained regular in-person communications with Roc Nation executives located in New York and traveled to New York regularly to present financial, operational, strategic, and business-development information concerning the DRNX Enterprise to senior Roc Nation leadership, including Colin Brown, Alex Ingram, Sean Mullvill, Vishal Madden, and Desiree Perez. Plaintiff was also required to submit quarterly reports to Ben Yardeni, Vice President of Finance, and Ben Kavesh, Director of Accounting, both of whom worked for Live Nation, LLC.

151. Plaintiff's work in New York was substantive and recurring, and constituted a material part of the Chief Executive Officer position from which she was ultimately removed. Plaintiff regularly traveled to Roc Nation's New York offices in her capacity as Chief Executive Officer to perform executive-level work, including presenting the DRNX Enterprise's financial condition and performance to senior Roc Nation leadership, participating in high-level meetings

concerning enterprise governance, financing, operations, strategy, and business development, and meeting with Roc Nation executives concerning matters within Plaintiff's responsibility and authority as Chief Executive Officer.

152. Defendants' discriminatory and retaliatory conduct therefore had a direct impact upon Plaintiff's employment and work in New York. By stripping Plaintiff of her executive authority, excluding her from enterprise operations and communications, terminating her benefits and compensation, and ultimately removing her from the Chief Executive Officer position, Defendants deprived Plaintiff of the ability to continue performing the substantial and recurring executive work that she had performed in New York.

153. During Plaintiff's employment, Roc Nation controlled the flow of capital into the DRNX Enterprise and repeatedly tightened, delayed, or restricted operating funding, creating continuous operational and financial strain that Plaintiff was required to manage. Plaintiff pleads that those same funding conditions were later invoked to criticize or undermine her performance and authority.

154. As Roc Nation tightened and restricted the ebb and flow of capital into the DRNX Enterprise, vendors went unpaid or were paid late, payroll became strained, and the enterprise experienced persistent liquidity deficiencies affecting ordinary business operations.

155. As a result of Roc Nation's repeated funding restrictions and delays, Plaintiff was forced, on multiple occasions, to use her personal credit cards to purchase basic office supplies, cover routine operating expenses (expenses exceeding $10,000 for which Plaintiff was never reimbursed), and personally advance payroll funds to employees through the Zelle platform to keep the DRNX Enterprise operational.

156. Roc Nation maintained effective control over the enterprise's financial lifeline,

releasing or withholding operating capital, including the timing and amount of funding released to the business. The predictable result was recurring instability. Payroll became chronically chaotic. Plaintiff was left to manage those disruptions without Roc Nation's support.

157. Upon information and belief, certain employee compensation was, at times, paid outside the ordinary ADP payroll process through transfers made using the Zelle platform. Plaintiff does not know what payroll deductions, tax withholdings, employer contributions, or other statutory obligations, if any, were calculated, withheld, remitted, or otherwise accounted for in connection with those payments. The use of *ad hoc* payment methods further underscored the operational instability created by Roc Nation's recurring funding shortages and the absence of reliable payroll funding.

**THE ATLANTA TRADE SHOW – AUGUST 2025**

158. On or about August 28, 2025, at the Horizon Retailers Association's C-Store Connect Trade Show in Atlanta, Georgia, attended by vendors, customers, and prospective business partners, Jackson confronted Plaintiff at the DRNX Enterprise booth and, within the hearing of third parties, falsely accused her of engaging in inappropriate sexual conduct by "grabbing his crotch," referring to a male DRNX employee, on the evening of August 27, 2025.

159. Jackson further accused Plaintiff of inappropriate sexual contact with a male prospective business partner, stating in substance and word to the effect that she was "kissing on him," "all up in his face," "making out with him," "sitting on his fucking lap," and being "all over him" in the back seat of an Uber rideshare on August 27, 2025, and stating, "I should fire your ass right now."

160. Plaintiff immediately and vehemently denied each of Jackson's defamatory accusations.

161. Plaintiff alleges that Jackson knew the accusations were false and acted with reckless disregard for their truth or falsity.

162. Jackson's published statements concerned Plaintiff and were false and were published to third parties, including Kevin Carter ("Carter"), Pete Black ("Black"), Melissa Burbank ("Burbank"), Deal, and a prospective business partner.

163. Jackson did not retract those statements.

164. The statements directly impugned Plaintiff's professional fitness and accused her of sexual misconduct and unchastity, causing reputational and professional harm.

**September and October 2025**

165. Jackson continued to confront and interrogate Plaintiff through profanity-laced rants, repeatedly demanding that she "admit" that DRNX Enterprise funds had been misspent and, in September 2025, warning her that an audit was "headed [her] way."

166. Plaintiff responded that she welcomed an audit. The DRNX Enterprise's books and records were maintained transparently and were available to both Jackson and Roc Nation, including records reflecting operational expenditures.

167. Plaintiff rejected Jackson's repeated attempts to dictate how she should perform her responsibilities as Chief Executive Officer.

168. Jackson was not Plaintiff's supervisor, held no officer or management position within the DRNX Enterprise, possessed no authority over Plaintiff, and lacked comparable executive experience or professional qualifications for the Chief Executive Officer role. Nevertheless, Jackson repeatedly presumed authority over Plaintiff's performance, challenged her decisions, and demanded that she justify her management of the enterprise to him.

169. As a direct result of Roc Nation's termination of DRNX Enterprise funding in July

2025 and its drip-style funding, Plaintiff was forced to reduce headcount in the summer of 2025, terminating "T.B." and later "D.F."

170. Those employment terminations resulted directly from Roc Nation's trickle funding and the resulting financial condition of the DRNX Enterprise.

171. In October 2025, Plaintiff terminated employee Carter as a result of a lack of payroll funding by Roc Nation.

**DECEMBER 2025**

172. By the end of 2025, Plaintiff informed Jackson that she had personally incurred and was owed more than $10,000 in unreimbursed expenses on behalf of DRNX Water.

173. Plaintiff further learned from Jackson that Roc Nation's decision to reduce or withhold funding from DRNX Water during 2025 was not the product of financial necessity or business judgment.

174. Rather, according to Jackson, he and Desiree Perez wanted to "see what she would do."

175. Upon information and belief, Jackson represented to Plaintiff that he and Desiree Perez intentionally restricted funding to observe how Plaintiff would respond under conditions of financial stress.

176. Jackson continued to confront, berate, scream, and curse at Plaintiff for refusing his narrative with regard to the 2025 spend, and was furious that Plaintiff would not surrender to his repeated menacing demands.

177. Jackson repeatedly demanded to know why Plaintiff was communicating directly with Roc Nation personnel and insisted that Plaintiff disclose and justify those communications to him.

178. Jackson's demands were not grounded in any legitimate reporting structure, as he possessed no formal managerial or governance authority over Plaintiff's communications with Roc Nation.

179. Rather, they reflected Jackson's continuing effort to dominate enterprise operations, monitor Plaintiff's interactions with Roc Nation, and assert control over a Chief Executive Officer who refused to subordinate herself to his unofficial authority.

180. Plaintiff repeatedly refused to recognize Jackson's claimed authority over her role, communications with Roc Nation, or exercise of her duties as Chief Executive Officer. As Plaintiff continued to resist Jackson's efforts to control enterprise operations, Jackson's conduct became increasingly hostile, culminating in Plaintiff's decision to work remotely in January 2026 to avoid further harassment and abuse.

**JANUARY 15, 2026**

181. On January 15, 2026, Plaintiff spoke with Jackson, as there were insufficient funds in DRNX Water’s bank account to make payroll, and after berating Plaintiff for twenty-five minutes, Jackson hung up on Plaintiff.

182. Upon information and belief, later that day, Jackson contacted Plaintiff’s assistant and made arrangements for a payroll deposit with instructions to the employee to pay the DRNX payroll, and instructions to pay Plaintiff a random Three Thousand Dollars ($3,000), a payment that Plaintiff refused and was never issued; Plaintiff rejected Jackson's effort to use undocumented money via Zelle to shut her up.

183. Later that day, Jackson escalated his campaign against Plaintiff beyond the workplace and into her marriage.

184. On January 15, 2026, Jackson undertook a deliberate effort to circumvent Plaintiff

and insert himself into Plaintiff's marriage and personal life.

185. Throughout the morning, Jackson repeatedly telephoned Plaintiff's husband, Mr. Huffman, placing multiple back-to-back calls in an apparent effort to secure a private audience with him.

186. Concerned by the unusual and persistent nature of the calls, Mr. Huffman contacted Plaintiff at approximately 1:21 p.m. and asked whether she knew why Jackson was attempting to reach him so urgently. Plaintiff advised that she did not.

187. Mr. Huffman thereafter unsuccessfully returned Jackson's call. Jackson immediately called him back, and the two spoke for approximately thirty-two minutes.

188. During that conversation, Jackson did not merely criticize Plaintiff or discuss business disagreements. Upon information and belief, Jackson devoted a substantial portion of the call to making false and defamatory statements concerning Plaintiff's alleged sexual misconduct, lack of personal integrity, and claimed that Plaintiff was a racist.

189. Jackson repeated prior accusations concerning a prospective business partner encountered during the August 2025 trade show and, in doing so, materially expanded and embellished the story.

190. Upon information and belief, Jackson falsely claimed that Plaintiff had been making out with a prospective business partner, kissing him in the back of the Uber, that Plaintiff fired D.F. because he was black, stated that DRNX employee Carter left because Plaintiff was spending too much money, stated that he dealt with celebrities all the time, and claimed that he had photos.

191. During this same call, Jackson inquired, upon information and belief, why Plaintiff was ignoring him, Mr. Huffman responded, in sum and substance, stating that Plaintiff was

avoiding Jackson because Jackson was falsely telling people lies about Plaintiff, defaming her, and was falsely accusing Plaintiff of sleeping around to get business, to which Jackson responded, it's a fact, and you can ask anybody that was there.

192. All of Jackson's statements to Mr. Huffman concerned Plaintiff were false, and were defamatory *per se*.

193. Carter, however, left his position at DRNX after observing Roc Nation's lapses in funding of the enterprise,  concluding that the entity was doomed to fail, and deciding to start his own consulting firm. Jackson's statement regarding Mr. Carter's departure was different from, and substantially more inflammatory than, the accusations Jackson had previously communicated to others in August 2025 and likewise false.

194. What had previously been described by Jackson as Plaintiff grabbing Mr. Carter's crotch at a bar, and making out with a male prospective business partner in an Uber shared ride, evolved into allegations that Plaintiff was leveraging sexual relationships to obtain business for the enterprise.

195. Each retelling by Jackson introduced new false details.

196. Each Jackson version became more salacious.

197. Each publication by Jackson expanded the scope of the alleged sensational conduct. The accusations did not remain constant because they were not based upon an actual event. Rather, the story evolved as Jackson adapted it to different audiences and circumstances.

198. The progression of the allegations demonstrates a deliberate effort to manufacture a false and defamatory narrative that would humiliate Plaintiff, destroy her credibility, undermine her authority as Chief Executive Officer, and portray her professional accomplishments as the product of sexual conduct rather than competence, experience, and hard work.

199. Jackson's decision to direct these defamatory accusations to Plaintiff's husband was particularly malicious.

200. Rather than confronting Plaintiff directly, Jackson deliberately injected himself into Plaintiff's marriage, family relationships, and personal space in his ongoing efforts not only to sabotage Plaintiff's professional reputation, but to wreck her marriage through false claims of infidelity.

201. After concluding the call, upon information and belief, Jackson contacted DRNX employee Black and represented, in substance, that he had discussed Plaintiff with Mr. Huffman and that Mr. Huffman agreed with Jackson's criticisms of Plaintiff.

202. Jackson further represented, in substance, that Mr. Huffman had acknowledged that Plaintiff "needed" Jackson's treatment because she was not accustomed to people challenging her.

203. Upon information and belief, Jackson used his conversation with Mr. Huffman to create the false impression that Plaintiff's own husband had validated Jackson's attacks on Plaintiff and endorsed Jackson's conduct, which is false.

204. The publication to Mr. Huffman and the subsequent republication to Black each constituted separate and independent acts of per se defamation by Jackson.

205. The sequence of events reflects far more than a routine business communication. It demonstrates Jackson's willingness to bypass Plaintiff entirely, recruit her spouse into his false narrative, distort and lie about the substance of that conversation, and then weaponize it within the enterprise to further diminish Plaintiff's credibility and authority.

206. The significance of Jackson's conduct lies not merely in the falsity of the accusations themselves, but in the extraordinary lengths to which he went to disseminate them. Having already spread false and sexualized accusations concerning Plaintiff among coworkers,

subordinates, and business associates, Jackson deliberately sought out Plaintiff's husband, persisted until he secured an audience, expanded the accusations he had previously made, and then republished the results of that conversation, infused with further falsity, within the enterprise.

207. Jackson's conduct was deliberate, calculated, malicious, and intended to inflict maximum personal and professional harm upon Plaintiff.

**THE JANUARY 22, 2026 MEETING**

208. On or about January 22, 2026, Jackson convened a meeting attended by Plaintiff's direct reports and other DRNX Enterprise personnel, including Jackie Jablonski ("Jablonski"), Chris Hinson ("Hinson"), Black, Deal, and another unidentified third party.

209. Plaintiff had advised Jackson in a prior communication that she could not attend on January 22 due to a previously scheduled leadership meeting, but Jackson nevertheless proceeded with the meeting in Plaintiff's absence and with her team present.

210. Jackson held no officer, manager, or director position within the DRNX Enterprise and possessed no formal authority to supervise Plaintiff or direct enterprise personnel.

211. During the January 22, 2026 meeting, and in the presence of multiple DRNX employees, Jackson publicly criticized Plaintiff's business decisions and expenditures. While attacking Plaintiff's judgment concerning a recent $20,000 marketing expenditure involving Banana Ball players, Jackson stated words to the effect: Twenty thousand dollars is too much. If I was going to spend twenty thousand dollars, I'd rather pay two women to sleep with me.

212. Jackson's comment was not an isolated offhand remark. It was made during a meeting Jackson called, purportedly to review enterprise finances and operations, and was offered as a criticism of Plaintiff's business judgment. By equating a legitimate business expenditure with paying women for sex, Jackson injected sexualized and degrading commentary into a professional

discussion, demeaned Plaintiff in front of her subordinates, and reinforced the hostile environment that had developed within the enterprise.

213. During the same meeting, Jackson reviewed enterprise expenditures line by line and repeatedly accused Plaintiff of wasting money, authorizing improper expenditures, and misusing enterprise funds. These accusations were published in the presence of DRNX employees and were part of Jackson's broader effort to defame Plaintiff and undermine Plaintiff's credibility, authority, and fitness to continue serving as Chief Executive Officer.

214. During the same meeting, upon information and belief, Jackson made false and defamatory statements concerning Plaintiff's alleged sexual conduct and business practices, including words to the effect: I don't care what she does to get business, but [Mr. Huffman] is my friend, and I don't like how she's doing him, and claimed that Plaintiff was using sex to close deals.

215. In context, Jackson's statement conveyed to those present that Plaintiff had engaged in inappropriate sexual conduct with a prospective business partner to obtain business opportunities or favorable treatment for the DRNX Enterprise.

216. Jackson further falsely stated, as a purported statement of fact, that Plaintiff had engaged in intimate or romantic conduct with a prospective business partner during the August 2025 trade show, including claims that Plaintiff had made out with the individual at a bar, sat on his lap, kissed him. Jackson further stated words to the effect that Plaintiff had grabbed a DRNX employee's crotch.

217. Jackson's defamatory account had further evolved since his telephone call with Mr. Huffman, as Jackson added the further false claim that Plaintiff had made out with a prospective business partner later that evening in an Uber vehicle.

218. Jackson’s defamatory statements continued to expand and change over time.

219. All of the foregoing statements are false and defamatory *per se*.

220. The foregoing statements were communicated to multiple DRNX Enterprise employees and were understood by listeners as factual sexual assertions regarding Plaintiff's conduct, integrity, reputation, fidelity, professionalism, and fitness to serve as Chief Executive Officer.

221. By communicating to Plaintiff's subordinates and coworkers that Plaintiff obtained business opportunities through sexual conduct with a prospective business partner and engaged in inappropriate sexual contact with an employee, Jackson exposed Plaintiff to public contempt, ridicule, and professional disrepute and injured her reputation in her trade, profession, and occupation, and likewise imputed unchastity and sexual impropriety.

222. During the same January 22, 2026 meeting, Jackson further stated, upon information and belief, to DRNX Enterprise personnel, including Plaintiff’s subordinates and coworkers, that former DRNX employee Carter had left the company because of Plaintiff’s inappropriate conduct at the August 2025 trade show, because Carter felt uncomfortable in Plaintiff’s presence, and because Plaintiff had grabbed his crotch at the August 2025 trade show as the stated reason for Carter’s departure, all of which is false.

223. Jackson’s statements were false and defamatory *per se*.

224. Plaintiff never engaged in the conduct described by Jackson, and Mr. Carter's departure had no connection whatsoever to any alleged sexual misconduct, vendor relationship, or personal conduct by Plaintiff.

225. As Jackson well knew, Mr. Carter's employment ended because of budgetary and capital constraints imposed upon the DRNX Enterprise after Roc Nation constricted its funding of

the DRNX Enterprise.

226. Having helped create the very financial conditions that necessitated workforce reductions, Jackson falsely attributed Mr. Carter's departure to fabricated allegations of sexual misconduct by Plaintiff. Jackson had separately told Plaintiff's husband that Mr. Carter left DRNX because Plaintiff was spending too much money.

227. Jackson's defamatory rant against Plaintiff continued.

228. Upon information and belief, Jackson stated, in sum and substance, that Plaintiff was racist and had terminated employees because they were Black.

229. Each of those statements was false.

230. The employees referenced by Jackson were separated from the DRNX Enterprise because of financial and budgetary constraints imposed by Roc Nation, and not because of race or any discriminatory motive.

231. Jackson also stated words to the effect that he doesn't even let his wife speak to him like that, referring to Plaintiff's communications with Jackson in her capacity as Chief Executive Officer.

232. The foregoing defamatory statements were communicated and published to Plaintiff's subordinates and coworkers and were understood by listeners as factual assertions concerning Plaintiff's sexual conduct, character, integrity, fidelity, professionalism, fitness for leadership, and treatment of employees.

233. By falsely accusing Plaintiff of sexual misconduct, racial bias, and improper conduct toward employees and business partners, Jackson subjected Plaintiff to a hostile work environment, contempt, ridicule, and professional disrepute and injured her reputation in her profession, occupation, and business.

234. Every false statement Jackson made was slanderous defamation and inherently damaging to Plaintiff's professional reputation and fitness to serve as Chief Executive Officer.

235. Jackson reinforced those false statements with additional conduct designed to intimidate and isolate Plaintiff.

**JACKSON'S STATEMENTS DIRECTLY ATTACKED PLAINTIFF'S FITNESS AS CEO**

236. Jackson's accusations were not limited to Plaintiff's personal life. Rather, Jackson repeatedly connected the alleged conduct to Plaintiff's performance of her professional duties as Chief Executive Officer.

237. Upon information and belief, and as alleged herein, Jackson repeatedly represented to employees, vendors, business partners, and others that Plaintiff obtained business opportunities, vendor relationships, enterprise advantages, and professional success through sexual conduct rather than through legitimate business efforts, experience, judgment, or professional competence.

238. Jackson further represented, in substance, that Plaintiff's business achievements were the product of inappropriate sexual relationships and that Plaintiff had improperly leveraged such conduct in connection with enterprise business activities.

239. Jackson's statements conveyed that Plaintiff lacked the honesty, integrity, professionalism, and ethical judgment necessary to perform the duties of a Chief Executive Officer and that her professional accomplishments were not legitimately earned.

240. Jackson's accusations additionally conveyed that Plaintiff was dishonest in her dealings with vendors, business partners, and enterprise stakeholders and had engaged in conduct fundamentally inconsistent with the fiduciary, managerial, and leadership responsibilities entrusted to a senior executive.

241. By accusing Plaintiff of using sexual conduct to secure business opportunities and

by repeatedly characterizing Plaintiff's professional success as the product of sexual relationships rather than competence, Jackson directly attacked Plaintiff in her profession, occupation, trade, and business and sought to destroy her credibility as the executive responsible for leading the DRNX Enterprise.

242. The natural and intended consequence of Jackson's statements was to cause employees, vendors, distributors, business partners, and others to question Plaintiff's integrity, judgment, qualifications, and fitness to continue serving as Chief Executive Officer.

### PLAINTIFF REPORTS JACKSON'S SEXUAL HARASSMENT AND OTHER UNLAWFUL CONDUCT TO ROC NATION

243. Following Jackson's January 22, 2026, sexual tirade against Plaintiff, Plaintiff received a complaint from a female employee concerning Jackson's repeated sexualized comments, degrading remarks, and conduct during the meeting.

244. The employee expressed concern that Jackson's behavior had created a hostile and offensive work environment and reported that she was deeply troubled by the nature and frequency of his misconduct.

245. By that point, Plaintiff could no longer ignore what was occurring.

246. As Chief Executive Officer, Plaintiff was responsible for maintaining a workplace free from sexual harassment, discrimination, retaliation, and unlawful workplace conduct.

247. Jackson's unlawful behavior had progressed far beyond an isolated incident.

248. It had become a recurring pattern of sexualized, demeaning, defamatory and disruptive conduct affecting not only Plaintiff, but other employees within the enterprise.

249. Plaintiff was therefore placed in an untenable position.

250. She could either remain silent while Jackson continued to subject employees to sexualized misconduct and workplace intimidation, or fulfill her obligations as Chief Executive

Officer and report the conduct. Plaintiff chose the latter.

251. At the same time, Plaintiff's personal life had been attacked by Jackson; in his false and defamatory statements published to Mr. Huffman, Plaintiff could simply no longer remain silent regarding Jackson's escalating campaign of sexualized defamation directed at her personally.

252. On January 30, 2026, Plaintiff wrote to Colin Brown and Alex Ingram, reporting Jackson's false sexual allegations, sexual harassment, governance breakdown, ownership conflict, and Jackson's effort to remove Plaintiff as Chief Executive Officer.

253. In a follow-up call between Plaintiff and Mr. Ingram, Plaintiff repeated Jackson's escalating unlawful and abusive behavior, to which Mr. Ingram responded, in sum and substance, Oh wow. I don't even know what to say to that; I have no words.

254. Plaintiff, Brown, and Ingram had a call later that same day, during which Plaintiff elaborated on her written report and protected complaints and described the conduct alleged above.

255. Roc Nation acknowledged receipt of the complaint, and Brown confirmed during that call that Roc Nation needed to handle the matter and that Plaintiff should give them time to reach out to Jackson concerning her report.

256. Plaintiff's report to Messrs. Brown and Ingram was detailed and specific, including the August 28, 2025 trade show incident, the defamatory statements made to Plaintiff's husband, the January 22, 2026 meeting, Jackson's false statements, the witnesses present, and the sexual harassment of both Plaintiff and another female employee.

257. Upon information and belief, between January 30, 2026 and the week of February 10, 2026, Roc Nation informed Jackson of Plaintiff's complaints concerning his unlawful conduct.

258. The temporal proximity between Plaintiff's protected complaints and the adverse actions that followed, including Jackson's escalating sexual harassment and retaliation, Plaintiff's

exclusion from DRNX Enterprise communications, the effective elimination of her authority, and the cessation of compensation and benefits, supports the inference that Defendants acted in concert and in retaliation for Plaintiff's protected activity.

**THE UNAUTHORIZED DIVERSION OF PLAINTIFF'S EMAIL COMMUNICATIONS**

259. Upon information and belief, shortly after Plaintiff reported Jackson's unlawful conduct to Roc Nation on January 30, 2026, Jackson undertook additional actions designed to monitor, circumvent, and interfere with Plaintiff's ability to communicate confidentially concerning the matters she had reported.

260. At all relevant times, Plaintiff utilized a DRNX Enterprise email account in her capacity as Chief Executive Officer.

261. That email account contained highly sensitive and confidential communications, including communications concerning enterprise operations, finances, vendors, distributors, personnel matters, governance issues, strategic planning, legal issues, and Plaintiff's ongoing communications with Roc Nation concerning Jackson's conduct.

262. Upon information and belief, after learning of Plaintiff's complaints to Roc Nation, Jackson instructed DRNX employee Deal to inform the third-party IT entity to implement automatic forwarding of Plaintiff's email communications to a third-party email account associated with Jackson and/or his wife, Joni Jackson.

263. Upon information and belief, the IT third-party individual requested that Deal provide that instruction in writing before implementing the forwarding directive.

264. Upon information and belief, Deal provided the written forwarding directive, and it was thereafter implemented through administrative access to the DRNX Enterprise email system.

265. Plaintiff subsequently observed, in real time, that her incoming email

communications were being automatically diverted and forwarded to an email account outside of her control, *to wit*, jo125@icloud.com. The only person in the DRNX organization who used an @icloud.com email address was Jackson, j.jackson.05@icloud.com

266. Upon information and belief, the recipient account was associated with Jackson and/or Joni Jackson.

267. Neither Jackson nor Joni Jackson was an officer, employee, human resources professional, compliance officer, attorney, manager, or other individual authorized to receive Plaintiff's confidential executive communications.

268. Upon information and belief, the automatic forwarding continued for a period of time and resulted in the ongoing diversion of Plaintiff's confidential communications to individuals who had no legitimate business need to receive them.

269. The communications subject to forwarding included confidential business information, executive-level communications, personnel matters, operational information, vendor communications, partnership discussions, financial information, and other proprietary enterprise information.

270. Upon information and belief, the forwarding arrangement provided Jackson with access to information concerning Plaintiff's activities, communications, relationships, and efforts to report and address Jackson's misconduct.

271. The timing of the forwarding directive is significant. It occurred after Plaintiff reported Jackson's conduct to Roc Nation and while Plaintiff was actively seeking intervention from Roc Nation leadership.

272. Upon information and belief, the forwarding of Plaintiff's communications was not undertaken for any legitimate business purpose. Rather, it was intended to monitor Plaintiff, obtain

access to information concerning her communications and protected complaints, and further Jackson's efforts to undermine Plaintiff's authority and position within the enterprise.

273. Upon information and belief, Roc Nation, DRNX Water, DRNX LLC, or their agents knew of, approved, ratified, authorized, or failed to prevent the diversion of Plaintiff's communications despite possessing the authority and ability to stop it.

274. The unauthorized diversion of Plaintiff's executive communications further eroded Plaintiff's ability to function as Chief Executive Officer, compromised the confidentiality of enterprise communications, and constituted an additional component of the retaliatory campaign directed against Plaintiff after she reported Jackson's misconduct.

**ROC NATION INFORMS JACKSON OF PLAINTIFF'S COMPLAINTS**

275. Upon information and belief, after Plaintiff reported Jackson's conduct to Brown and Ingram, Roc Nation personnel located in New York communicated directly with Jackson regarding Plaintiff's complaints, the allegations against him, Plaintiff's continued role as Chief Executive Officer, and her future within the Roc Nation and DRNX Enterprise.

276. Upon information and belief, Jackson thereafter communicated with Roc Nation personnel regarding Plaintiff, her protected complaints, her employment status, her authority within the enterprise, and her future operation of the DRNX Enterprise and her employment status with Roc Nation.

277. Rather than investigate Plaintiff's complaints, protect her from further misconduct, or take corrective action against Jackson, Defendants permitted the conduct described herein to continue and escalate.

278. Plaintiff was increasingly marginalized within the organization, excluded from meetings and communications, stripped of authority, denied meaningful support, and subjected to

continuing hostility after reporting the misconduct.

279. The temporal proximity between Plaintiff's protected complaints and the adverse actions that followed, together with Defendants' failure to investigate, failure to intervene, and continued empowerment of Jackson, supports the inference that Defendants ratified the conduct at issue and retaliated against Plaintiff for reporting it.

280. The resulting deterioration of Plaintiff's authority, credibility, and working conditions was not remedied.

281. Defendants permitted the harassment to deepen, and the resulting deterioration in Plaintiff’s authority and working conditions was ultimately used as a basis to further diminish Plaintiff’s role within the DRNX Enterprise.

282. Rather than immediately investigating the allegations, removing Jackson from positions of influence, or implementing protective measures, Roc Nation advised Plaintiff that it would review the matter and requested additional time, indicating that it would respond after the Grammys and the Super Bowl.

**February 8 and 9, 2026**

283. By February 8, 2026, Plaintiff had still received no meaningful response from Roc Nation regarding her complaints.

284. The misconduct had been reported.

285. The witnesses were known.

286. The allegations were known.

287. Yet no investigation had commenced, no corrective action had been taken, and Jackson remained fully empowered within the enterprise.

288. Upon information and belief, Roc Nation (as well as Berg) had communicated with

Jackson concerning Plaintiff's complaints on or before February 9, 2026.

289. What followed was immediate.

290. That day, Jackson contacted Plaintiff's husband, Mr. Huffman, through the company office telephone and discussed arranging a meeting involving Jackson, Plaintiff, Mr. Huffman, and Jackson's wife, Joni Jackson.

291. The proposed meeting had nothing to do with legitimate business operations and instead reflected Jackson's continuing effort to insert himself into Plaintiff's marriage and personal life.

292. The same day, Jackson contacted an employee and sought an in-person meeting with her.

293. The following day, February 10, 2026, Jackson met with that employee in person.

294. That meeting was recorded by the employee.

295. During that meeting, and in a further effort to terrorize Plaintiff's assistant, Jackson stated all of the following:

- "Me and Roc Nation been together for a long time, we've made over hundreds of millions of dollars."
- Admitted that he repeatedly spoke to Plaintiff's husband.
- Claimed he was not the one who told Plaintiff's husband anything, "because where I come from, snitches get killed. Where I come from."
- Asserted that "There was seven motherfuckers seeing everything you seen. Don't you never fucking say JJ said. When we were fucking there, what I said, and I will tell you what I said, what I said was what the fuck is this, you know, what the fuck is she doing (indiscernible). I don't know. So that's exactly what I said. I don't know. Maybe she's

doing it to get the job done."

- Claimed that a Roc Nation driver had made a complaint about Plaintiff, and that "I got that thing taken care of without saying nothing to nobody."
- Stated, "I'm really trying to get in touch with Amy like, you stupid motherfucker, don't tell him yourself, don't tell him yourself, you stupid motherfucker. You trying to point a finger at me saying JJ this, JJ that, you're pointing a finger at the wrong motherfucker."
- Stated concerning Plaintiff that "you put dirt on my name, I'll show your ass."
- Stated that "the same way [Mr. Huffman is] going to protect his wife, the same way my wife [Joni Jackson] gonna protect me," adding that his wife was "great with this" and "great with that."
- With regard to Plaintiff, questioned whether "you think that job will accept that video?"; "get that arrogant shit out of your mind"; "You don't want to lose your husband and your kids and your family."
- Stated that Plaintiff fired two African-American employees because they were Black, suggesting that the terminations were racially motivated; "And I'm just saying, I'm getting paperwork from their lawyers, I was fired because of discrimination, racial, what the fuck are you talking about now? What the fuck? Once again, I don't know why they fucking got fired," and "[s]o I'm the one taking the wrath of there's no black people work here, both black people were fired. Oh, we're filing a discrimination. Oh, wait a minute, fella. What the fuck are you all talking about? I don't even know you all got fired. You see what I'm saying? So that's the type of shit that I had to do without me talking to you, Amy or anything. You know what I'm saying?" and "I don't know

why they fucking got fired" and "I didn't say, Amy, why are you firing all the black people?"

- Claimed that one of those former employees had a lawyer who asserted that the termination was based upon racial discrimination.
- Stated with regard to Plaintiff, "[s]o you need to get your motherfucking ass back in this office and put a fucking smile on your face and let's win, because it's not like you're gonna get a nice job somewhere else and leave us astray. It's not gonna happen."
- Referring to Plaintiff, stated, "maybe she's sellin it to get the job done."
- Performed what he claimed was Plaintiff's behavior in Atlanta, Georgia, directed at a male DRNX employee, stating on the recording, "she gets behind him and does this, kicking his dick and balls."

296. The recording captures, among other things, Jackson's continuation of the allegedly defamatory statements concerning Plaintiff after Roc Nation had notice of her complaints, statements probative of retaliatory motive, and communications reflecting Jackson's relationship with Roc Nation.

297. The audio also confirms Jackson's insertion of new false statements: Jackson now claimed that a Roc Nation driver had made a complaint concerning Plaintiff, that Jackson had "got that thing taken care of," and that Jackson possessed "film" and "video" that purportedly documented Plaintiff's conduct.

298. Later that day, February 10, 2026, Jackson sent a text message to Plaintiff and Plaintiff's husband stating: "Hey [Mr. Huffman], we talked yesterday and you said we all need to meet. I'm willing to do that like I said yesterday. I have 2 days to do that. Then I will have to move on with the CEO position. Thank you."

299. The message was remarkable. Plaintiff had reported misconduct to Roc Nation. Roc Nation had taken no action. Yet Jackson, rather than Roc Nation, was openly discussing the future of Plaintiff's Chief Executive Officer position and imposing his own self-declared deadline regarding her continued employment and authority.

**February 16, 2026**

300. On February 16, 2026, Plaintiff again reported Jackson's conduct to Brown and Ingram in writing.

301. Plaintiff advised Roc Nation that Jackson had effectively removed her authority as Chief Executive Officer, was independently communicating with distributors and strategic partners, was excluding Plaintiff from meetings, and was informing others that Plaintiff was no longer permitted to participate in enterprise operations.

302. Plaintiff further advised Roc Nation that enterprise partners were expressing concern regarding DRNX's direction and continuity, that Jackson was interfering with vendor relationships, and that Jackson had informed third parties that obligations incurred during Plaintiff's tenure were Plaintiff's responsibility rather than those of the DRNX Enterprise.

303. Most significantly, Plaintiff advised Roc Nation that Jackson had informed members of her team that he intended to move forward without her despite the absence of any board action, governance process, or formal change in Plaintiff's role.

304. Plaintiff further advised Roc Nation that Jackson was making false allegations accusing her of sexual misconduct and financial improprieties to employees and third parties.

305. Plaintiff expressly informed Roc Nation that those accusations were false and that Jackson's conduct was creating operational instability, reputational harm, partner confusion, and significant risk to the enterprise.

306. Despite receiving this detailed report, Roc Nation neither initiated a meaningful investigation nor implemented any measures to protect Plaintiff from the continuing misconduct.

307. This February 16, 2026 communication is significant because it eliminated any conceivable claim that Roc Nation lacked notice.

308. By that date, Roc Nation had been informed that Plaintiff had been stripped of authority, excluded from business operations, subjected to false accusations of sexual misconduct and financial wrongdoing, undermined before employees and third parties, and effectively displaced from her role.

309. Nevertheless, rather than intervening to stop Jackson's conduct, Roc Nation shifted its focus to Plaintiff's future with the enterprise and, within days, began discussions concerning her transition.

310. On February 16, 2026, during a telephone call between Plaintiff and Black, Black confirmed that he and others "were scared…because Jackson is paying our checks right now" and from his "vantage point, we don't know how to go forward without JJ not because of his strategy but because of the financial repercussions….our loyalty to JJ right now is a paycheck."

311. Later in that same conversation, Black adds Jackson to the call and, at some point, announces that he is not recording it.

331. But Plaintiff was.

332. During the continued conversation between Plaintiff, Jackson and Black, Jackson repeatedly defamed Plaintiff, including all of the following, claiming with regard to Plaintiff that all she does is "fire black people," claiming that DRNX employee D.F. sent Jackson "lawyer papers from the guy D.F. showing there was some racist shit going on, I get that shit out of the way...[and] taken care of," when Plaintiff listed a number of Jackson's prior defamatory statements

in emphatically denying them, Jackson stated "you did do that. Period. Point Blank. I'll show you…everything you said you didn't do, you did...and [is] a total lie…I'll show you I promise," "I can show you – film don't lie," Jackson acknowledged that he knew that Plaintiff had made complaints to Daniel (Berg), Deal and the company (Roc Nation), claimed that the "driver has it as well," referring to alleged sexual conduct by Plaintiff in the rideshare, Jackson stated concerning Carter, that Plaintiff "get behind him and put your foot on his dick and balls…while he was shooting pool."

333. All of Jackson's false statements were published to Black and were defamatory *per se*.

**FEBRUARY 19, 2026**

334. Three days later, Plaintiff participated in a call with Colin Brown and Alex Ingram.

335. By this point, Plaintiff had reported Jackson's conduct, provided witnesses, described the retaliation, endured continued interference with her authority, and repeatedly sought intervention from Roc Nation.

336. Rather than discussing corrective action against Jackson, however, the conversation focused on Plaintiff's "transition."

337. Plaintiff complained. Jackson remained empowered. The conduct continued. Roc Nation failed to investigate. Roc Nation failed to intervene.

338. After initially reporting Jackson's misconduct to Roc Nation on January 30, 2026, Plaintiff had followed up with Roc Nation leadership, seeking a response to her complaints on February 3, 6, 16, and 19, 2026.

339. On February 27, 2026, upon information and belief, Jackson informed Black and Hinson that Plaintiff was no longer associated with DRNX and boasted that he had fired her. Roc

Nation never substantively responded to the merits of Plaintiff's complaints, never commenced an investigation while Plaintiff remained in her position, and never implemented corrective action before Plaintiff was ousted.

340. Plaintiff's health benefits were terminated that same day.

341. Plaintiff's salary, which was funded through Roc Nation, ceased on or about March 15, 2026, without prior notice.

342. Plaintiff was never provided a formal notice of termination, nor did she resign her position.

343. At all relevant times, Plaintiff remained ready, willing, and able to perform the duties of Chief Executive Officer.

344. Upon information and belief, the decision to terminate Plaintiff's benefits, cease her compensation, and remove her from the enterprise was discussed, approved, authorized, implemented, or ratified by Roc Nation personnel located in New York, along with Berg, and the DRNX Enterprise.

345. Upon information and belief, Jackson actively participated in, influenced, or sought to influence those decisions and communications.

346. Upon information and belief, after Plaintiff reported Jackson's conduct to Roc Nation (and Berg) and before Plaintiff was ousted, no meaningful investigation was conducted, no witness statements were obtained from the individuals identified by Plaintiff, no remedial measures were implemented, and no restrictions were imposed upon Jackson's ability to continue interacting with Plaintiff or enterprise personnel.

**PLAINTIFF'S PROTECTED ACTIVITY**

347. Beginning no later than January 2026, Plaintiff repeatedly engaged in protected activity by reporting conduct that she reasonably believed constituted unlawful sexual harassment, sex-based hostility, retaliation, workplace misconduct, and other unlawful employment practices.

348. Plaintiff reported Jackson's conduct to Roc Nation, including Chief of Staff and Legal Counsel Colin Brown and Head of Mergers and Acquisitions Alex Ingram, both of whom supervised Plaintiff's work as Chief Executive Officer and exercised substantial influence over the governance, funding, and strategic direction of the DRNX Enterprise.

349. Plaintiff's complaints included reports that Jackson was engaging in repeated sexualized comments concerning women, making false accusations that Plaintiff obtained business opportunities through sexual conduct, creating a hostile and degrading work environment for female employees, interfering with Plaintiff's ability to perform her duties as Chief Executive Officer, and engaging in retaliatory conduct after Plaintiff challenged his behavior.

350. Plaintiff provided Roc Nation (and Berg) with detailed information regarding Jackson's conduct, identified witnesses, reported specific incidents, and repeatedly requested intervention and assistance.

351. On January 30, 2026, February 6, 2026, and February 16, 2026, among other occasions, Plaintiff expressly reported Jackson's conduct to Roc Nation and advised that the situation was escalating, creating operational instability, damaging enterprise relationships, and exposing the enterprise to substantial legal and reputational risk.

352. Plaintiff reasonably believed that the conduct she reported violated applicable laws, company policies, and fundamental workplace standards.

353. Roc Nation (and Berg) were therefore placed on actual notice of Plaintiff's complaints and protected activity.

**SEX-BASED CONDUCT AND HOSTILITY TOWARD PLAINTIFF**

354. Throughout Plaintiff's tenure, Jackson repeatedly directed sex-based comments, stereotypes, and accusations toward Plaintiff and other women associated with the enterprise.

355. Jackson repeatedly accused Plaintiff of obtaining business opportunities through sexual conduct, falsely claimed that Plaintiff engaged in inappropriate sexual activity with prospective business partners, had improperly touched an employee, and repeatedly attempted to diminish Plaintiff's professional accomplishments by attributing them to sexual conduct rather than competence and performance.

356. Jackson further made repeated comments objectifying women and reducing their professional value to their perceived sexual utility.

357. During the January 22, 2026 meeting, Jackson launched an extended and highly offensive tirade in which he repeatedly discussed Plaintiff's alleged sexual conduct, accused Plaintiff of engaging in inappropriate relationships, and made vulgar comments concerning women generally.

358. Jackson's conduct was sufficiently severe and pervasive that at least one female employee subsequently complained that the January 22, 2026 meeting created what she felt to be a hostile work environment.

359. Plaintiff herself became the primary target of Jackson's sex-based comments, accusations, and hostility.

360. Upon information and belief, Jackson's treatment of Plaintiff was motivated, at least in part, by Plaintiff's status as a female executive who refused to submit to Jackson's demands, validate his criticisms, or surrender her independent business judgment.

**RETALIATION FOLLOWING PLAINTIFF'S PROTECTED COMPLAINTS**

361. Following Plaintiff's protected complaints, Jackson intensified his efforts to marginalize, discredit, and remove Plaintiff from her position.

362. Plaintiff was excluded from meetings, communications, and strategic discussions that fell squarely within her responsibilities as Chief Executive Officer.

363. Jackson communicated directly with distributors, vendors, and business partners while simultaneously informing Plaintiff that she was not permitted to participate.

364. Jackson informed employees and third parties that he intended to move forward without Plaintiff, despite the absence of any board action, governance process, or lawful authority to remove her.

365. Jackson continued to disseminate false statements concerning Plaintiff's alleged sexual conduct, professional competence, and integrity after learning that Plaintiff had complained to Roc Nation.

366. Roc Nation was repeatedly informed of this escalating retaliation, yet failed to implement meaningful corrective measures.

367. Rather than protecting Plaintiff after receiving her complaints, Roc Nation permitted Jackson's conduct to continue and, within weeks of Plaintiff's complaints, shifted its focus toward Plaintiff's future with the enterprise rather than the misconduct she had reported.

368. The temporal proximity between Plaintiff's complaints and the adverse actions that followed supports the inference that Plaintiff's protected activity was a substantial motivating factor in Defendants' campaign to remove her from the enterprise.

369. Counsel for Jackson, the DRNX Enterprise, and Ball has identified himself to Plaintiff's counsel as representing those parties. Upon information and belief, that counsel separately contacted a former DRNX Enterprise employee, on or about June 3, 2026, in an effort to solicit information and corroboration in support of Jackson's account of the events alleged herein. Upon information and belief, that employee did not provide counsel with any information supporting Jackson's account.

370. For months, Roc Nation and Berg had everything they needed to stop Jackson: detailed complaints, named witnesses, a recorded confession. They did nothing. Not an investigation. Not a warning. Not a single question asked of Jackson. Plaintiff reported sexual harassment and retaliation to the people with the power to end it, and they let Jackson finish the job he started, until Plaintiff was gone.

371. Only then did the DRNX Entities' lawyer find an appetite for investigation. Only then did counsel start making calls. Not to investigate Jackson's misconduct, but instead trying to find former employees who might help build a case against Plaintiff.

372. Immediately before the filing of this Complaint, Black wrote to Plaintiff that "JJ is blowing up my phone," referring to Jackson's repeated telephone calls to him on August 21, 2026, apparently scrambling for someone, anyone, willing to support the lies Jackson had been telling about Plaintiff.

**DEFENDANTS KNEW AND DID NOTHING**

373. The conduct described above was not isolated. It reflected a continuous course of

discriminatory, defamatory, and otherwise unlawful conduct directed at Plaintiff by Jackson and knowingly tolerated by the remaining Defendants, and each of them actively retaliated against Plaintiff following her complaints, allowing escalating unlawful conduct to occur and failed on multiple opportunities to intervene.

374. Roc Nation and the DRNX Enterprise had actual notice of Jackson's misconduct. They all failed to initiate a meaningful investigation, failed to interview witnesses, failed to instruct Jackson to cease his conduct, failed to issue corrective communications, failed to protect Plaintiff, and thereafter participated in and ratified the retaliatory conduct directed against her.

375. By March 2026, Plaintiff had been stripped of her authority, excluded from enterprise operations, publicly represented as terminated, deprived of her benefits, and ultimately deprived of her compensation. Whether characterized as a formal termination, *de facto* termination, or constructive discharge, Plaintiff was effectively removed from the position she had been hired to perform shortly after reporting Jackson's misconduct to Roc Nation.

376. Prior to Plaintiff's January 30, 2026 complaints, Roc Nation had never advised Plaintiff that her performance was deficient, had never issued a written warning, had never imposed a performance improvement plan, and had never communicated that her continued employment was in jeopardy.

377. It was only after Plaintiff reported Jackson's misconduct and demanded intervention that Defendants began characterizing Plaintiff's performance as deficient.

378. The timing of those assertions supports the inference that any purported performance concerns were pretextual and advanced only after Plaintiff engaged in protected activity and reported Jackson's unlawful conduct.

379. The events described herein were not the product of misunderstanding, personality conflicts, or ordinary business disagreements. They were the foreseeable consequence of a toxic, vulgar, and hostile workplace in which Jackson repeatedly abused his influence, weaponized false and sexualized defamatory accusations against Plaintiff, undermined Plaintiff's authority, and engaged in a sustained campaign of harassment, retaliation, intimidation, and defamation directed at the very executive charged with leading the enterprise.

380. Plaintiff repeatedly reported Jackson's conduct. Roc Nation repeatedly received those reports. The misconduct escalated. Plaintiff's authority diminished. Her benefits were terminated. Her compensation ceased. Discussions concerning Plaintiff's replacement began. The sequence was neither coincidental nor subtle.

381. Jackson is directly liable for his own conduct. He made the false statements, and he can own them. He disseminated the falsehoods. He repeatedly accused Plaintiff of obtaining business through sexual conduct, injected Plaintiff's personal life into workplace disputes, interfered with her authority, sought to isolate her from employees and business partners, and actively participated in the efforts that ultimately deprived Plaintiff of the ability to perform the role for which she had been hired.

382. Roc Nation and Berg are directly liable because each received Plaintiff's complaints, including factual summaries and identifiable witnesses, understood the nature and seriousness of the allegations, possessed the ability to investigate and intervene, and exercised substantial influence over the governance, funding, and strategic direction of the enterprise.

383. Despite possessing actual notice of the unlawful conduct, Roc Nation and Berg failed to conduct a meaningful investigation, failed to implement corrective measures, failed to

protect Plaintiff, failed to stop Jackson's conduct, and instead permitted the resulting damage to Plaintiff's authority and reputation to spread throughout the enterprise.

384. Upon information and belief, Roc Nation thereafter participated in, approved, implemented, or ratified decisions that diminished Plaintiff's authority, terminated her benefits, ceased her compensation, and removed her from the enterprise.

385. Upon information and belief, DRNX Water possessed actual knowledge, through Berg (and by extension Jackson himself), that Jackson was bypassing Plaintiff, communicating directly with employees and business partners regarding her future with the company, excluding her from meetings and decision-making, interfering with vendor and distributor relationships, and making defamatory statements concerning Plaintiff's alleged sexual misconduct and criticizing the spending of company funds.

386. Despite that knowledge, DRNX Water failed to protect its Chief Executive Officer, failed to preserve an orderly governance structure, permitted enterprise personnel and resources to be used in furtherance of Jackson's campaign against Plaintiff, and implemented the practical consequences of that crusade by permitting Plaintiff's authority, access, and role within the enterprise to be diminished.

387. Although Plaintiff remained the duly appointed Chief Executive Officer, DRNX LLC knowingly permitted Jackson to exercise *de facto* control over personnel, finances, distributors, vendors, and strategic relationships without corresponding governance action, documented authority, or legitimate corporate process.

388. Upon information and belief, DRNX LLC possessed actual knowledge (through Berg and Jackson) that Jackson was bypassing Plaintiff, interfering with her executive authority, communicating directly with employees and business partners concerning her future with the

company, and making serious defamatory allegations regarding Plaintiff's alleged sexual misconduct and misuse of company funds.

389. Rather than restraining that conduct, requiring compliance with established governance procedures, or protecting the authority of its Chief Executive Officer, DRNX LLC knowingly permitted Jackson to continue exercising unchecked influence over the enterprise.

390. DRNX LLC's liability does not arise solely from Jackson's ownership interest.

391. Rather, it arises from DRNX LLC's own actions and omissions.

392. Upon information and belief, DRNX LLC ratified Jackson's conduct by permitting him to exercise authority he did not formally possess, by failing to investigate repeated reports of misconduct, by allowing enterprise personnel and resources to be used in furtherance of his campaign against Plaintiff, and by accepting the benefits of the altered power structure that resulted.

393. By the time Plaintiff's authority had been effectively stripped away, DRNX LLC possessed both knowledge of the misconduct and the practical ability to stop it. It chose to do nothing.

394. Each Defendant played a distinct but indispensable role in the misconduct described herein.

395. Jackson supplied the harassment, retaliation, intimidation, and defamatory statements that set these events in motion.

396. Roc Nation and Berg received Plaintiff's complaints, possessed the ability to intervene, controlled the funding and strategic direction of the enterprise, and elected not to stop the misconduct after receiving detailed notice of it.

397. DRNX Water implemented the practical consequences of Jackson's campaign by permitting Plaintiff's authority to be undermined, her relationships to be disrupted, and her role within the enterprise to be diminished.

398. DRNX LLC supplied the governance structure through which Jackson's conduct was permitted to continue unchecked and knowingly allowed him to exercise authority beyond that formally conferred upon him.

399. Acting individually and collectively, Defendants possessed knowledge of material facts, the ability to prevent further harm, and repeated opportunities to intervene.

400. Defendants did precisely nothing.

401. Instead, Defendants permitted the misconduct to escalate until Plaintiff's authority, reputation, compensation, benefits, and position within the enterprise had been effectively wrecked.

402. By the time Defendants' conduct had run its course, Plaintiff's authority had been stripped away, her professional reputation had been attacked and ruined, her relationships with employees, vendors, and business partners had been damaged, her ability to lead the enterprise had been stripped, and the position she had been hired to build had effectively been hijacked by Jackson.

403. These were not unintended consequences. They were the predictable result of Defendants' collective actions, omissions, ratifications, and failures to act.

404. Plaintiff brings this action to hold each Defendant accountable for its respective role in the unlawful misconduct described herein and to recover all damages proximately caused by Defendants' actions, omissions, participation, ratification, and failures to act.

405. As a direct and proximate result of Defendants' shameful conduct, Plaintiff lost her position, compensation, benefits, authority, professional standing, and the career opportunity she had been recruited to build. She further suffered reputational harm, damage to business relationships, emotional distress, and other damages to be proven at trial.

## COUNT I

## DEFAMATION *PER SE*
(AGAINST DEFENDANT JERMAINE JACKSON)

406. Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

407. Jackson repeatedly made and published false statements of fact concerning Plaintiff to third parties, including employees, consultants, vendors, business associates, Plaintiff's husband Mr. Huffman, Black, Jablonski, Deal, Hinson, and others.

408. Among other things, Jackson falsely stated, in substance, that Plaintiff obtained business opportunities through sexual relationships; engaged in sexual or intimate conduct with vendors, employees, and business associates; grabbed a male employee's crotch; used sex to obtain business for the DRNX Enterprise; engaged in inappropriate sexual conduct during the August 2025 trade show; terminated employees because they were Black; engaged in racist conduct; mismanaged enterprise finances; improperly spent company funds; and was dishonest, incompetent, and professionally unfit to serve as Chief Executive Officer.

409. Jackson further published the specific sexualized accusations alleged above, including his assertion that Plaintiff placed her foot on a man's genitals while he was shooting pool and his repeated accusations concerning Plaintiff's purported sexual conduct with vendors and business associates.

410. Each of those statements stated or conveyed objectively verifiable assertions of fact concerning Plaintiff's conduct and was reasonably understood by its recipients as asserting actual facts about Plaintiff, rather than opinion, rhetorical hyperbole, or other protected expression.

411. The statements were false.

412. Jackson knew that the statements were false or acted with reckless disregard for their truth or falsity.

413. Jackson published and repeatedly republished the statements to persons other than Plaintiff, without privilege.

414. Jackson's accusations directly attacked Plaintiff in the conduct of her profession as Chief Executive Officer by falsely portraying her as dishonest, professionally incompetent, racially discriminatory toward employees, financially irresponsible, and willing to obtain business through sexual conduct rather than professional competence.

415. The statements directly tended to injure Plaintiff in her trade, business, and profession and therefore constituted defamation per se.

416. Jackson's sexualized accusations additionally subjected Plaintiff to humiliation, contempt, ridicule, and reputational injury and were calculated to undermine her authority and professional standing within the DRNX Enterprise.

417. Jackson's defamatory publications were not isolated. Beginning no later than August 2025 and continuing through at least February 27, 2026.

418. Jackson repeated and embellished his accusations to multiple audiences as part of his campaign to discredit Plaintiff and remove her from the Chief Executive Officer position.

419. As a direct and proximate result of Jackson's defamatory publications, Plaintiff suffered substantial injury to her professional and personal reputation, damage to existing and prospective business relationships, economic loss, emotional distress, and other damages to be determined at trial.

420. Jackson's knowing or reckless publication of false statements concerning Plaintiff, together with the spite, ill will, and deliberate effort to injure Plaintiff alleged herein, defeats any claim of qualified privilege and warrants punitive damages to the fullest extent permitted by law.

421. At all relevant times, Plaintiff was a respected business executive.

422. Plaintiff was likewise a Chief Executive Officer, wife, and mother whose professional reputation was central to her livelihood.

### JACKSON'S PUBLICATION OF FALSE AND DEFAMATORY ACCUSATIONS CONCERNING PLAINTIFF

423. Jackson did not confine his attacks on Plaintiff to private disagreements concerning management of the DRNX Enterprise. He communicated accusations concerning Plaintiff's honesty, financial stewardship, professional competence, and sexual conduct to third parties, including employees and persons with whom Plaintiff had professional and personal relationships.

424. Among other things, on February 10, 2026, Jackson acknowledged that Plaintiff's husband had been told that Jackson was accusing Plaintiff of "stealing money." Jackson recounted being confronted directly with the accusation: "she's saying that you're saying she's stealing money." Jackson later returned to the accusation, stating: "Stealing money? Don't ever lie on me, Amy, don't ever lie on me saying you're stealing money."

425. Jackson likewise recounted that Plaintiff's husband confronted him with Plaintiff's report that Jackson was "telling the employees that she's having sex with guys to get deals done."

426. Jackson then repeated and amplified the sexual insinuation rather than dispelling it. He recounted that Plaintiff's husband asked, "was she making out with somebody in the back of the truck?" to which Jackson responded, "I don't know. Let's have a meeting," and added that he did not know whether Plaintiff had "told on herself or not."

427. Jackson further described the alleged incident to Jablonski in a manner unmistakably insinuating sexual impropriety by Plaintiff. Referring to his own wife allegedly witnessing what occurred, Jackson asked Jablonski to imagine seeing "the CEO I hired…doing whatever," and separately repeated the account that Plaintiff supposedly claimed she merely "helped the guy out" because he was intoxicated.

428. Jackson also admitted that the allegations had become a subject of discussion among multiple DRNX personnel. He proposed a meeting involving Plaintiff, her husband, Carter, Deal, Ameen, and Black to address what allegedly occurred, expressly contemplating asking, "Pete, what happened? Kevin, what happened? Ameen, what happened? Everett, what happened?" Jackson then stated, "where I come from, snitches get killed," and admitted, "I swept all that shit under the rug."

429. Jackson's statements concerning Plaintiff were not limited to sexual accusations. He attacked Plaintiff's professional competence and stewardship of the company, questioning why she had spent company funds on a football machine, asserting concerning Jazz's contract, "You did it. There was errors in that," and stating, "I'm not going to let my company fall because you're not doing what you're supposed to do."

430. Jackson's publication on February 10, 2026, went beyond repeating a false accusation. He represented that he possessed video evidence substantiating the sexual misconduct he was insinuating, stating that he had "film on every fucking thing" and "the whole film from the

bar, the entry of the hotel, the leaving out." Jackson then expressly connected the purported video to Plaintiff's ability to obtain future employment, asking rhetorically whether another employer would "accept that video," directing Plaintiff to "clean up your fucking act," and invoking the threatened loss of her "husband," "kids," and "family," before demanding, "So which one is it going to be?"

431. Particularly significant, Jackson sought to lend credibility to his accusations by claiming that "the driver made a complaint" and stating that he "got that thing taken care of without saying nothing to nobody." Later in the same recorded meeting, Jackson made the claimed connection to Roc Nation explicit, stating, in reference to Plaintiff, "That fucking driver made a fucking complaint to Roc Nation, you stupid motherfucker." Jackson thus represented that a complaint concerning Plaintiff's alleged conduct had reached Roc Nation and simultaneously claimed that he had gotten the matter "taken care of" without disclosing it to others.

432. Jackson's own recorded words thus establish that accusations concerning Plaintiff's supposed financial dishonesty, professional misconduct, and sexual behavior were being communicated among multiple persons associated with the DRNX Enterprise and beyond it. They further demonstrate Jackson's own participation in repeating, perpetuating, and lending credence to those accusations after they had begun circulating, causing injury to Plaintiff's professional and personal reputation.

433. The particular defamatory publications upon which Plaintiff relies include, without limitation, the following:

| **Date / Occasion** | **Particular Words Published by Jackson, Verbatim or in Substance** | **Concerning Plaintiff / Falsity** | **Person(s) to Whom Published** |
|---|---|---|---|
| August 28, 2025; C-Store | Plaintiff had been grabbing his crotch, referring to DRNX employee Carter; Plaintiff was | The statements expressly concerned Plaintiff and falsely | Carter; Black; Burbank; a male vendor |

| **Date / Occasion** | **Particular Words Published by Jackson, Verbatim or in Substance** | **Concerning Plaintiff / Falsity** | **Person(s) to Whom Published** |
|---|---|---|---|
| Connect Trade Show, Atlanta | kissing on a male prospective business partner, was all up in his face, making out with him, sitting on his fucking lap, and was all over him in the back seat of an Uber. | accused her of sexual and intimate misconduct with an employee and vendor in connection with enterprise business. Plaintiff immediately denied them. The accusations were false. | representative; and others within hearing at the DRNX booth. |
| January 15, 2026; Telephone call with Mr. Huffman | Plaintiff had been making out with a prospective business partner at a bar and kissing him in the back of the Uber; Plaintiff fired D.F. because he was black; Carter left because Plaintiff was spending too much money; Jackson had photos supporting his accusations; and, when confronted with the accusation that he was falsely telling people Plaintiff was sleeping around to obtain business, Jackson responded: it's a fact, and you can ask anybody that was there. | Each statement expressly concerned Plaintiff. Plaintiff had not engaged in the alleged sexual conduct, had not terminated D.F. because of race, and had not obtained business through sexual relationships. The statements were false. | Mr. Huffman |
| January 15, 2026; Following the call with Mr. Huffman | Jackson represented, in substance, that Mr. Huffman agreed with Jackson's criticisms of Plaintiff and had acknowledged that Plaintiff needed Jackson's treatment because she was not accustomed to people challenging her. | The statements concerned Plaintiff and falsely represented that her own husband had validated Jackson's attacks upon her and endorsed his treatment of her. Mr. Huffman had not done so. | Black. |
| January 22, 2026; DRNX Enterprise meeting | I don't care what she does to get business, but [Mr. Huffman] is my friend, and I don't like how she's doing him, and Plaintiff was using sex to close deals. | The statements expressly concerned Plaintiff and falsely asserted as fact that Plaintiff used sexual conduct and infidelity to obtain business for | Hinson; Black; Deal; and other DRNX Enterprise personnel present at the meeting. |

| **Date / Occasion** | **Particular Words Published by Jackson, Verbatim or in Substance** | **Concerning Plaintiff / Falsity** | **Person(s) to Whom Published** |
|---|---|---|---|
| | | DRNX. Plaintiff did not do so. | |
| January 22, 2026; Same meeting | Plaintiff had made out with a male prospective business partner at a bar, sat on his lap, kissed him, and because Plaintiff had grabbed his crotch at the August 2025 trade show. | The statements expressly concerned Plaintiff and falsely accused her of sexual and intimate conduct with an employee and/or vendor in connection with enterprise business. The accusations were false. | Hinson; Black; Deal; and other DRNX Enterprise personnel present. |
| January 22, 2026; Same meeting | Carter left DRNX because of Plaintiff's inappropriate conduct at the August 2025 trade show, because Carter felt uncomfortable around Plaintiff, and because Plaintiff had grabbed his crotch at the August 2025 trade show. | The statements expressly concerned Plaintiff and were false. Carter's departure was unrelated to sexual misconduct by Plaintiff and resulted from the enterprise's financial/funding circumstances. | Plaintiff's subordinates, coworkers, and other DRNX Enterprise personnel present. |
| January 22, 2026; Same meeting | Plaintiff was racist and terminated employees because they were Black. | The statements expressly concerned Plaintiff and falsely accused her of racial discrimination in the performance of her duties as Chief Executive Officer. The referenced personnel decisions resulted from financial and budgetary constraints, not race. | Plaintiff's subordinates, coworkers, and other DRNX Enterprise personnel present. |
| February 10, 2026; Recorded meeting with DRNX employee | Jackson repeated and amplified sexualized accusations concerning Plaintiff, including recounting the accusation that Plaintiff was "selling yourself to this man to get a deal," and later stating, "Maybe she's doing it | The statements expressly concerned Plaintiff and falsely accused her of using sexual conduct to obtain business and of engaging in sexual | Jackie Jablonski, with other persons intermittently present within hearing during portions of the |

| **Date / Occasion** | **Particular Words Published by Jackson, Verbatim or in Substance** | **Concerning Plaintiff / Falsity** | **Person(s) to Whom Published** |
|---|---|---|---|
| | to get the job done." Purporting to reenact Plaintiff's conduct toward Carter, Jackson further stated: "she gets behind him and does this, kicking his dick and balls." | misconduct with an employee in connection with enterprise business. The accusations were false. | recorded meeting. |
| February 10, 2026; Same recorded meeting | Jackson stated that "film don't lie" and "Video. It don't lie"; claimed that "the driver made a complaint"; stated that he "got that thing taken care of without saying nothing to nobody"; claimed, "I got film on every fucking thing"; and stated that he had "the whole film from the bar, the entry of the hotel, the leaving out." Jackson later stated that the "driver made a fucking complaint to Roc Nation." | The statements expressly concerned the accusations against Plaintiff and falsely represented that purported film or video evidence and a driver complaint substantiated allegations of sexual misconduct by Plaintiff. No such misconduct occurred. | Jackie Jablonski, with other persons intermittently present within hearing during portions of the recorded meeting. |
| February 10, 2026; Same recorded meeting | Jackson stated that Plaintiff had "fired the two African American guys"; described the resulting accusation as "some racial profiling"; stated, "there's no black people work here, both black people were fired. Oh, we're filing a discrimination"; and stated that he was "getting paperwork from their lawyers" asserting, "I was fired because of discrimination, racial." | The statements concerned Plaintiff and republished and lent credence to accusations that Plaintiff's personnel decisions were racially discriminatory. Plaintiff had not terminated employees because of race. The accusations were false. | Jablonski, with other persons intermittently present within hearing during portions of the recorded meeting. |
| February 16, 2026; Recorded telephone conversation | Jackson claimed, with regard to Plaintiff, that all she does is "fire black people"; claimed that a former employee had supplied "lawyer papers" showing "some racist shit going on"; and, when Plaintiff denied Jackson's accusations, stated, "you did do that. Period. Point | The statements expressly concerned Plaintiff and falsely accused her of racial discrimination in the performance of her duties as Chief Executive Officer. Plaintiff had not | Black, with Plaintiff also participating in and recording the call. |

| **Date / Occasion** | **Particular Words Published by Jackson, Verbatim or in Substance** | **Concerning Plaintiff / Falsity** | **Person(s) to Whom Published** |
|---|---|---|---|
| | Blank," and "everything you said you didn't do, you did." | terminated employees because of race. The accusations were false. | |
| February 16, 2026; Same recorded telephone conversation | Jackson claimed that he could show Plaintiff evidence supporting his accusations, stated that "film don't lie," claimed that "the driver has it as well," and accused Plaintiff of sexual conduct involving Carter, including stating that Plaintiff would "get behind him and put your foot on his dick and balls . . . while he was shooting pool." Jackson further stated: "Pete, when we was in that bar, wasn't she sitting on this man's lap, smacking him in the face, kissing him and all the bullshit? Let's bring it out, let's be honest." | The statements expressly concerned Plaintiff and falsely accused her of sexual misconduct, infidelity, and unchaste conduct, while representing that purported film, video, or other evidence substantiated those accusations. The accusations were false. | Black, with Plaintiff also participating in and recording the call. |
| February 27, 2026 | Jackson represented that Plaintiff was no longer associated with DRNX and boasted that he had fired her. | The statements expressly concerned Plaintiff's employment and professional status and were false when made as alleged: Plaintiff had not resigned or received formal notice of termination, no board action or other lawful process had removed her, and Jackson possessed no lawful authority to terminate Plaintiff. | Black and Hinson. |

434. Each publication identified above concerned Plaintiff, was reasonably understood by its recipient or recipients to concern Plaintiff, purported to state objectively verifiable facts concerning Plaintiff, and was false.

435. Jackson knew that the statements were false or acted with reckless disregard for their truth or falsity. His repeated alteration, embellishment, and expansion of the accusations, including his claims that photographs, film, video, complaints, or other evidence substantiated conduct that did not occur, further supports the inference that Jackson knew the accusations were false or recklessly disregarded their falsity and acted with spite or ill will toward Plaintiff.

436. Each publication constituted a separate defamatory publication and directly tended to injure Plaintiff in her trade, business, and profession by falsely portraying her, in her capacity as Chief Executive Officer, as using sexual conduct to obtain business, engaging in sexual misconduct with employees, vendors, and business partners, racially discriminating against employees, mismanaging enterprise funds, and lacking the honesty, competence, judgment, and fitness necessary to lead the enterprise.

437. The foregoing statements that falsely impugned Plaintiff's conduct, integrity, competence, and fitness as Chief Executive Officer directly tended to injure Plaintiff in her trade, business, and profession and therefore constitute defamation per se.

438. As a direct and proximate result of Jackson's conduct, Plaintiff has suffered substantial economic, professional, reputational, emotional, and other damages in an amount to be determined at trial.

439. Jackson acted intentionally, maliciously, willfully, wantonly, and with conscious disregard of Plaintiff's rights, thereby entitling Plaintiff to an award of punitive damages.

## COUNT II

## SEX DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
**Title VII of the Civil Rights Act of 1964**
**(Against Defendant Roc Nation LLC)**

440. Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

441. At all relevant times, Plaintiff was an employee of Roc Nation within the meaning of Title VII, and Roc Nation was an employer subject to Title VII.

442. Plaintiff is a woman and therefore a member of a class protected from discrimination because of sex under Title VII.

443. Throughout Plaintiff's tenure as Chief Executive Officer of the DRNX Enterprise, Jackson subjected Plaintiff to repeated sex-based and sexualized hostility, degradation, stereotyping, accusations, and intimidation that altered the conditions under which Plaintiff performed her employment.

444. Among other things, Jackson repeatedly accused Plaintiff of obtaining business opportunities through sexual conduct; attributed Plaintiff's professional success to purported sexual relationships rather than competence; accused Plaintiff of engaging in sexual conduct with a DRNX employee and with a prospective business partner; injected graphic sexual commentary into meetings concerning Plaintiff's professional performance; demeaned women generally; and repeatedly used sexualized accusations to attack Plaintiff's integrity, authority, and fitness to serve as Chief Executive Officer.

445. Jackson's conduct was neither isolated nor innocuous. It occurred repeatedly over a period of months, was directed at Plaintiff in connection with her professional responsibilities, was communicated to Plaintiff's subordinates and business associates, intruded into Plaintiff's

marriage and personal life, and was used to undermine Plaintiff's authority as the enterprise's senior executive.

446. During the January 22, 2026 meeting, Jackson directed an extended sexualized attack at Plaintiff, in her absence, before her direct reports and other enterprise personnel, and interjected degrading comments concerning women and sex into a purported business discussion. A female employee thereafter complained that Jackson's conduct had created a hostile and offensive work environment.

447. Jackson's hostility toward Plaintiff was sex-based. He repeatedly reduced Plaintiff's professional value and accomplishments to her alleged sexual availability, portrayed legitimate professional relationships as sexual relationships, and subjected Plaintiff to forms of degradation and stereotyping directed at her because she was a woman occupying and exercising authority as Chief Executive Officer.

448. Plaintiff reasonably perceived the environment as hostile and abusive, and the conduct was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and create an abusive working environment.

449. Roc Nation had actual notice of the sex-based hostile environment no later than January 30, 2026, when Plaintiff provided Colin Brown and Alex Ingram with a detailed written and oral complaint identifying Jackson's sexual harassment, sexualized accusations, witnesses, and misconduct toward Plaintiff and another female employee.

450. Roc Nation acknowledged Plaintiff's complaint and represented that the matter needed to be addressed. Plaintiff thereafter repeatedly followed up with Roc Nation concerning the continuing misconduct.

451. Despite that actual notice, Roc Nation failed to undertake prompt and effective remedial action. It did not timely interview the witnesses Plaintiff identified, did not conduct a meaningful investigation while Plaintiff remained in her position, did not restrict Jackson's access to Plaintiff or enterprise personnel, did not correct the false sexualized accusations, and did not prevent Jackson from continuing the conduct.

452. Instead, Jackson remained empowered within the enterprise and, after learning that Plaintiff had complained, intensified the sexualized attacks and intimidation directed at Plaintiff.

453. Roc Nation's failure to take prompt and effective corrective action permitted the hostile environment to continue and materially impaired Plaintiff's ability to perform and retain the Chief Executive Officer position.

454. As a direct and proximate result of the unlawful sex discrimination and hostile work environment, Plaintiff suffered loss of compensation and benefits, loss of employment and career opportunity, reputational and professional injury, emotional distress, and other damages to be determined at trial.

455. Roc Nation acted with malice or with reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to all compensatory and punitive remedies permitted by Title VII.

## COUNT III

**Retaliation**
**Title VII of the Civil Rights Act of 1964**
**(Against Defendant Roc Nation LLC)**

456. Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

457. Beginning no later than January 30, 2026, Plaintiff engaged in activity protected by Title VII by reporting conduct she reasonably and in good faith believed constituted sexual harassment, sex discrimination, and a hostile work environment.

458. Plaintiff reported that conduct directly to senior Roc Nation personnel, including Chief of Staff and Legal Counsel Colin Brown and Head of Mergers and Acquisitions Alex Ingram.

459. Roc Nation therefore had actual knowledge of Plaintiff's protected activity.

460. Plaintiff continued her protected activity by following up with Roc Nation concerning Jackson's escalating conduct on February 3, February 6, February 16, and February 19, 2026, among other occasions.

461. On February 16, Plaintiff specifically advised Roc Nation that Jackson had stripped her of authority, excluded her from enterprise operations, communicated directly with distributors and strategic partners, disseminated false accusations of sexual misconduct and financial impropriety, and represented to members of Plaintiff's team that the enterprise would move forward without her.

462. Roc Nation nevertheless failed to investigate or remediate Plaintiff's complaints and instead shifted its attention from Jackson's misconduct to Plaintiff's continued employment.

463. On February 19, 2026, rather than advising Plaintiff of corrective action concerning the conduct she had repeatedly reported, Brown and Ingram focused their discussion with Plaintiff upon her proposed "transition."

464. Following Plaintiff's protected activity, Plaintiff was progressively excluded from meetings, communications, distributor relationships, strategic discussions, and other matters

falling within her Chief Executive Officer responsibilities; her authority was effectively eliminated; and Jackson was permitted to continue circumventing and undermining her.

465. On February 27, 2026, Plaintiff's health benefits were terminated. Her salary ceased on or about March 15, 2026. Plaintiff was never provided formal notice of termination and did not resign.

466. The adverse actions began within weeks of Plaintiff's protected complaints and continued thereafter, were accompanied by Roc Nation's failure to address the very misconduct Plaintiff had reported, and occurred while Jackson remained empowered to continue the retaliatory campaign.

467. Upon information and belief, the decisions to eliminate Plaintiff's authority, terminate her benefits, cease her compensation, and remove her from the enterprise were discussed, authorized, approved, implemented, and/or ratified by Roc Nation.

468. Roc Nation's actions would dissuade a reasonable employee from reporting sexual harassment or sex discrimination and constituted unlawful retaliation because Plaintiff engaged in activity protected by Title VII.

469. Plaintiff's protected activity was a but-for cause of one or more of the materially adverse actions taken against her.

470. As a direct and proximate result of Roc Nation's retaliation, Plaintiff suffered loss of employment, compensation, benefits, earning capacity, professional standing, career opportunity, emotional distress, reputational harm, and other damages.

471. Roc Nation acted intentionally and with malice or with reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to the remedies authorized by Title VII.

## COUNT IV

## SEX DISCRIMINATION AND SEX-BASED HARASSMENT
**New York State Human Rights Law, N.Y. Exec. Law §§ 296(1)(a), 296(1)(h)**
**(Against Roc Nation LLC, DRNX Water LLC, and DRNX LLC)**

472. Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

473. Plaintiff is a woman and was protected from discrimination because of sex under the New York State Human Rights Law ("NYSHRL").

474. At all relevant times, Roc Nation LLC, DRNX Water LLC, and DRNX LLC, individually and collectively, exercised control over material aspects of Plaintiff's employment, including her compensation, benefits, executive responsibilities, funding, governance, working conditions, and continued service as Chief Executive Officer, as alleged above.

475. Throughout Plaintiff's tenure, Jackson subjected Plaintiff to repeated sex-based and sexualized hostility, including false accusations that Plaintiff obtained business through sexual conduct, engaged in sexual relationships with employees, vendors, and business partners, and achieved professional success through sexual conduct rather than competence, experience, and performance.

476. Jackson's conduct repeatedly reduced Plaintiff's professional accomplishments and value as a female Chief Executive Officer to her alleged sexual availability and subjected her to degrading sex-based stereotypes and hostility in connection with the performance of her executive responsibilities.

477. The conduct alleged herein constituted harassment because of Plaintiff's sex and subjected Plaintiff to inferior terms, conditions or privileges of employment because of her sex, in violation of N.Y. Executive Law § 296(1)(h).

478. Defendants further discriminated against Plaintiff because of her sex in the terms, conditions, and privileges of her employment, in violation of N.Y. Executive Law § 296(1)(a).

479. The unlawful conduct alleged herein had a direct impact upon Plaintiff in New York, where Plaintiff traveled regularly and performed her Chief Executive Officer responsibilities, including executive financial presentations, governance and strategic meetings, and other high-level work with Roc Nation's New York-based leadership, and from which work Defendants' discriminatory and retaliatory conduct ultimately excluded and removed her.

480. Defendants had actual notice of the discriminatory and hostile conduct, including through Plaintiff's detailed January 30, 2026 complaint and her repeated subsequent complaints identifying Jackson's conduct, specific incidents, and witnesses.

481. Despite actual notice and the authority and practical ability to intervene, Defendants failed to undertake prompt and effective corrective action, permitted Jackson to remain empowered within the enterprise, and permitted the discriminatory and hostile conduct to continue and escalate.

482. As a direct and proximate result of Roc Nation LLC, DRNX Water LLC, and DRNX LLC's violations of the NYSHRL, Plaintiff suffered economic loss, loss of compensation and benefits, loss of employment and career opportunity, professional and reputational injury, emotional distress, and other damages to be determined at trial.

## COUNT V

## RETALIATION
**New York State Human Rights Law, N.Y. Exec. Law § 296(7)**
**(Against Roc Nation LLC, DRNX Water LLC, and DRNX LLC)**

483. Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

484. Beginning no later than January 30, 2026, Plaintiff engaged in protected activity by reporting and opposing conduct she reasonably and in good faith believed constituted sexual harassment, sex discrimination, and a hostile work environment.

485. Defendants had actual knowledge of Plaintiff's protected activity.

486. The retaliatory conduct alleged herein had a direct impact upon Plaintiff in New York, where Plaintiff regularly traveled to perform her Chief Executive Officer responsibilities, including executive financial presentations, governance and strategic meetings, and other high-level work with Roc Nation's New York-based leadership, and from which work Defendants' retaliatory conduct ultimately excluded and removed her.

487. Following Plaintiff's protected complaints, Plaintiff was progressively excluded from meetings, communications, strategic discussions, distributor and vendor relationships, and other matters within her responsibilities as Chief Executive Officer; her executive authority was effectively eliminated; her benefits were terminated; her compensation ceased; and she was removed from the position she had been recruited to perform.

488. Those adverse actions occurred within days and weeks of Plaintiff's protected complaints and while Defendants permitted Jackson to continue exercising influence over enterprise personnel, operations, and Plaintiff's continued role.

489. Rather than investigate and remedy the discrimination Plaintiff reported, Defendants shifted their attention to Plaintiff's "transition" and thereafter participated in, authorized, implemented, approved, or ratified the actions that eliminated Plaintiff's authority, benefits, compensation, and position.

490. Plaintiff's protected activity was a motivating factor in, and causally connected to, the retaliatory actions taken against her.

491. Defendants thereby retaliated against Plaintiff for opposing practices prohibited by the NYSHRL, in violation of Executive Law § 296(7).

492. As a direct and proximate result, Plaintiff suffered the damages alleged herein.

## COUNT VI

### SEX DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
**New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1)(a)**
**(Against Roc Nation LLC, DRNX Water LLC, and DRNX LLC)**

493. Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

494. Plaintiff is a woman and is protected against discrimination because of sex and gender under the New York City Human Rights Law ("NYCHRL").

495. As alleged above, Plaintiff regularly performed substantive executive work in New York City, including work with Roc Nation leadership concerning the governance, financing, strategy, and operation of the DRNX Enterprise, and the discriminatory conduct alleged herein affected the terms, conditions, and privileges under which Plaintiff performed that work.

496. Plaintiff was therefore not merely employed by a New York-based company or affected by decisions originating in New York; she regularly performed substantive executive work in New York City itself, and the discriminatory conduct alleged herein deprived her of the ability to continue performing that New York City work.

497. Jackson repeatedly subjected Plaintiff to sex-based and sexualized degradation by portraying her professional accomplishments, business relationships, and effectiveness as Chief Executive Officer as the product of sexual conduct rather than professional competence.

498. Because of her sex and gender, Plaintiff was treated less well in the terms, conditions, and privileges of her employment and was subjected to sexualized hostility, degradation, and stereotyping that exceeded petty slights and trivial inconveniences.

499. Upon information and belief, Jackson used his influence within the Roc Nation/DRNX Enterprise to sabotage Plaintiff's professional reputation, authority, and career, including her employment relationship and executive work in New York City. Jackson repeatedly portrayed Plaintiff's professional success as a female Chief Executive Officer as the product of sexual conduct rather than competence, experience, and performance.

500. Defendants had actual notice of that conduct and failed to take prompt and effective corrective action, permitted Jackson's conduct to continue, and thereafter participated in or ratified actions that further diminished Plaintiff's authority and working conditions.

501. Defendants thereby discriminated against Plaintiff because of sex and gender in violation of the NYCHRL.

502. As a direct and proximate result, Plaintiff suffered the damages alleged herein.

**COUNT VII**

**RETALIATION**
**New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(7)**
**(Against Roc Nation LLC, DRNX Water LLC, and DRNX LLC)**

503. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

504. Plaintiff engaged in protected activity when she opposed and reported Jackson's sex-based and sexualized conduct, which she reasonably and in good faith believed violated the NYCHRL, beginning no later than January 30, 2026, and repeatedly thereafter.

505. These defendants knew of Plaintiff's protected activity.

506. Following those complaints, Plaintiff was excluded from enterprise operations and communications, stripped of executive authority, deprived of benefits and compensation, and ultimately removed from her position.

507. Those actions occurred in close temporal proximity to Plaintiff's complaints and under circumstances supporting the inference that they were undertaken because Plaintiff opposed and reported discriminatory conduct.

508. These defendants' conduct was reasonably likely to deter a person from engaging in protected activity under the NYCHRL.

509. Defendants thereby retaliated against Plaintiff in violation of Administrative Code § 8-107(7).

510. As a direct and proximate result, Plaintiff suffered the damages alleged herein.

## COUNT VIII

## AIDING AND ABETTING VIOLATIONS OF THE NYSHRL AND NYCHRL
**N.Y. Exec. Law § 296(6); N.Y.C. Admin. Code § 8-107(6)**
**(Against Defendant Daniel Berg)**

511. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

512. Berg was a member and approximately one-third owner of DRNX LLC and, through that ownership and governance role, possessed substantial influence over the DRNX Enterprise's governance, operations, and decision-making, including matters affecting Plaintiff's continued authority as Chief Executive Officer.

513. On January 30, 2026, Plaintiff personally reported to Berg Jackson's escalating sexualized conduct, false accusations concerning Plaintiff's sexual conduct and professional

integrity, interference with Plaintiff's authority, and the hostile working environment created by Jackson.

514. Plaintiff made those disclosures to Berg for the purpose of obtaining intervention and protection from the conduct she reasonably believed constituted unlawful sex discrimination and sexual harassment.

515. Berg therefore had actual knowledge of Plaintiff's protected complaint and of the discriminatory conduct Plaintiff had reported.

516. Upon information and belief, after receiving Plaintiff's January 30 complaint, Berg disclosed the substance of Plaintiff's complaint to Jackson, the very individual whose discriminatory conduct Plaintiff had reported.

517. Jackson confirmed his knowledge of Plaintiff's protected complaints during a telephone conversation on February 16, 2026 between Jackson, Plaintiff, and Black stating, "because you complained to - you complained to Daniel, you complained to Everett, you complained to people in, the company before -- you did that before you came and sat with me, Amy."

518. Jackson's recorded statement corroborates that, by February 16, 2026, he knew Plaintiff had reported his conduct to Berg and others within the Roc Nation/DRNX Enterprise. Upon information and belief, Berg's disclosure of Plaintiff's complaint was one source of that knowledge.

519. After learning of Plaintiff's protected complaint, Jackson intensified his campaign against Plaintiff, including continuing the sexualized accusations, interfering with Plaintiff's executive authority, excluding her from enterprise operations, and seeking her removal as Chief Executive Officer.

520. Berg's conduct was therefore not limited to passive knowledge or a failure to act. Upon information and belief, by communicating Plaintiff's protected complaint to Jackson and thereafter failing to take effective corrective measures despite his knowledge and governance authority, Berg actually participated in and facilitated the discriminatory and retaliatory conduct alleged herein.

521. Berg thereby knowingly aided and abetted and actually participated in the violations of the NYSHRL and NYCHRL committed against Plaintiff.

522. As a direct and proximate result of Berg's participation, Plaintiff suffered the damages alleged herein.

**COUNT IX**

**TORTIOUS INTERFERENCE WITH PLAINTIFF'S EMPLOYMENT RELATIONSHIP (Against Defendant Jermaine Jackson)**

523. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

524. Plaintiff maintained an existing employment relationship with Roc Nation pursuant to which Roc Nation employed Plaintiff as a W-2 employee to serve as Chief Executive Officer of the DRNX Enterprise, paid Plaintiff's salary, provided her employment benefits, supervised her work, and exercised substantial authority over the continuation and terms of her employment.

525. Jackson knew of Plaintiff's employment relationship with Roc Nation and knew that Plaintiff's continued compensation, benefits, authority, and position as Chief Executive Officer depended upon the continuation of that relationship.

526. Jackson was not Plaintiff's employer, supervisor, or coemployee and was not an officer, manager, director, or employee of Roc Nation. Nor did Jackson hold any officer, manager,

or director position within the DRNX Enterprise or possess lawful authority to terminate Plaintiff's employment.

527. Jackson nevertheless intentionally interfered with Plaintiff's employment relationship with Roc Nation for the purpose of causing Roc Nation to remove Plaintiff from her position, cease her compensation and benefits, and terminate or otherwise destroy her employment relationship.

528. Jackson did not accomplish that interference through lawful persuasion or legitimate business advocacy. Rather, Jackson employed independently tortious and wrongful means, including the repeated defamation of Plaintiff, knowing and intentional misrepresentations concerning Plaintiff's professional conduct and fitness, false accusations of sexual misconduct and racial discrimination, retaliatory intimidation, and the deliberate dissemination of those accusations to enterprise personnel and persons associated with Roc Nation.

529. Among other things, Jackson falsely represented that Plaintiff obtained business through sexual conduct; engaged in sexual misconduct with a DRNX employee and with a prospective business partner; terminated employees because they were Black; mismanaged enterprise funds; lacked the integrity and competence necessary to serve as Chief Executive Officer; and falsely claimed that photographs, film, video, complaints, or other evidence substantiated conduct that did not occur.

530. Jackson directed those wrongful acts not merely at Plaintiff, but to persons whose perceptions of Plaintiff affected her continued employment, authority, and standing within the enterprise, including Roc Nation-affiliated personnel, DRNX Enterprise employees, consultants, and others whose communications and relationships with Roc Nation and the enterprise bore directly upon Plaintiff's continued employment.

531. Jackson further undertook to usurp Plaintiff's employment authority despite possessing no lawful power to do so. After Plaintiff complained to Roc Nation about Jackson's unlawful conduct, Jackson informed Plaintiff and her husband on February 10, 2026 that he had "2 days" before he would "have to move on with the CEO position," notwithstanding that Plaintiff had not been terminated and Jackson possessed no authority over her employment.

532. Jackson thereafter represented to employees and third parties that Plaintiff was no longer permitted to participate in enterprise operations, communicated directly with distributors and strategic partners while excluding Plaintiff, represented that he intended to move forward without her notwithstanding the absence of board action or other lawful process, and continued disseminating false accusations concerning Plaintiff's sexual conduct, professional competence, integrity, and fitness to serve as Chief Executive Officer.

533. On February 27, 2026, Jackson went further and represented to Black and Hinson that Plaintiff was no longer associated with DRNX and boasted that he had fired her, despite lacking authority to terminate Plaintiff and despite Plaintiff never having resigned or received formal notice of termination.

534. Jackson's interference succeeded. Following Plaintiff's protected complaints and Jackson's escalating interference, Plaintiff's authority was effectively eliminated, her employment benefits were terminated on February 27, 2026, her Roc Nation-funded compensation ceased on or about March 15, 2026, and Plaintiff was removed from the position she had been recruited to build.

535. But for Jackson's intentional interference and use of independently tortious and wrongful means, Plaintiff's employment relationship with Roc Nation would have continued.

536. Jackson's conduct directly and proximately caused Plaintiff to lose her employment, salary, benefits, authority, career opportunity, professional standing, and other economic and noneconomic benefits flowing from her employment relationship.

537. Jackson acted intentionally, maliciously, and with knowledge that his false statements and other wrongful conduct were calculated to destroy Plaintiff's employment relationship and professional standing.

538. Plaintiff is therefore entitled to recover compensatory damages, including lost compensation, benefits and other pecuniary losses caused by Jackson's interference, together with punitive damages and all other relief permitted by law.

**COUNT X**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Against Defendant Jermaine Jackson)**

539. Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

540. Separate and apart from the defamatory publications alleged in Count I and the independently tortious interference alleged in Count IX, Jackson engaged in additional intentional and non-defamatory conduct directed at Plaintiff's personal dignity, marriage, family relationships, and emotional well-being.

541. Jackson repeatedly subjected Plaintiff to sexualized degradation and intimidation; deliberately inserted himself into Plaintiff's marriage by persistently contacting her husband and attempting to enlist him against Plaintiff; threatened Plaintiff's future livelihood, including by stating that it was "not like [she was] gonna get a nice job somewhere else"; and invoked the threatened loss of Plaintiff's "husband," "kids," and "family" before demanding, "So which one is

it going to be?" Jackson continued and escalated this personal intimidation after learning that Plaintiff had reported him to Roc Nation and sought protection from his misconduct.

542. Jackson's conduct was not an isolated workplace disagreement or ordinary employment dispute. It constituted a sustained campaign deliberately calculated to humiliate, intimidate, destabilize, and injure Plaintiff both professionally and personally.

543. Jackson intended to cause Plaintiff severe emotional distress or acted in disregard of a substantial likelihood that his conduct would cause such distress.

544. Jackson's conduct was extreme and outrageous and, considered cumulatively and in context, exceeded the bounds of decency tolerated in a civilized society.

545. As a direct and proximate result of Jackson's conduct, Plaintiff suffered severe emotional distress, trauma, humiliation, anxiety, weight loss, anguish, disruption of her personal and family life, and resulting injury and damages.

546. Jackson's conduct was intentional, malicious, wanton, and undertaken with conscious disregard for Plaintiff's rights, warranting an award of punitive damages.

WHEREFORE, Plaintiff Amy Huffman respectfully requests judgment in her favor and against Defendants, jointly and severally to the extent permitted by law, and an award of:

a. compensatory damages in an amount to be determined at trial, including lost wages and compensation, lost benefits, back pay, front pay and/or lost earning capacity as permitted by law, injury to Plaintiff's professional reputation and career, damage to existing and prospective business relationships, emotional distress, mental anguish, and other consequential damages;

b. punitive damages against the Defendants against whom such damages are legally recoverable, in an amount sufficient to punish and deter the willful, malicious, reckless, and consciously indifferent conduct alleged herein;

c. appropriate equitable relief under Title VII and other applicable law, including reinstatement or front pay in lieu thereof as appropriate;

d. prejudgment and post-judgment interest;

e. reasonable attorneys' fees, expert fees, and costs under Title VII, the New York State Human Rights Law, the New York City Human Rights Law, and every other applicable statutory basis;

f. declaratory and injunctive relief as the Court deems just and proper, including appropriate relief addressing the continuing effects of Defendants' unlawful conduct upon Plaintiff's employment and professional reputation; and

g. such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: New York, New York
August 21, 2026

**BRAZZANO LAW PLLC**
*Attorneys for Plaintiff Amy Huffman*

By: /s/ Rebecca Brazzano

Rebecca Brazzano
43 West 43rd Street, Suite 264
New York, NY 10036
Tel.: 561.685.3812
Email: RBrazzano@BrazzanoLaw.com

## VERIFICATION

I, Amy B. Huffman, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint. The factual allegations stated therein based upon my personal knowledge are true and correct. As to matters stated upon information and belief, I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 08/21/26 day of August, 2026.

Amy Huffman (Aug 21, 2026 17:40:03 EDT)

Amy B. Huffman